**LOUISIANA & ARKANSAS RAILWAY CO., Plaintiff,**

v.

**Nina N. ANTHONY and Graydon Anthony, Partners, d/b/a Graydon Anthony Lumber Company, Defendants.**

Civ. A. No. 786.

United States District Court
W. D. Arkansas,
Texarkana Division.

Nov. 22, 1961.

Hardin, Barton & Hardin, Fort Smith, Ark., for plaintiff.

Shaver, Tackett & Jones, Texarkana, Ark., for defendants.

JOHN E. MILLER, Chief Judge.

### Statement

This is an action by the plaintiff, Louisiana & Arkansas Railway Company, a Delaware corporation, against defendants, Nina N. Anthony and Graydon Anthony, partners, d/b/a Graydon Anthony Lumber Company, seeking to recover the amount which it had paid in settlement of a claim asserted against it by one Herman Cloudy, under the provisions of the Federal Employers' Liability Act, 45 U.S. C.A. § 51 et seq., for which plaintiff claims the defendants are obligated to indemnify it.

The plaintiff in its complaint filed February 21, 1961, in addition to the usual allegations of corporate capacity and jurisdiction, alleged:

That on or about the 4th day of September 1941 the plaintiff and defendants entered into what is commonly referred to as an "Industry Track Agreement" for the construction of a 737-foot industrial spur to serve the defendants' lumber yard; that said contract contained provisions which fixed minimum clearances, liabilities of the parties, and indemnification of the railroad by the industry; that the same parties entered into a similar Industry Track Agreement on the 22nd day of May, 1957, by which the 737-foot industrial spur was extended an additional 185 feet.

That on the 15th day of May, 1959, at approximately 10:00 p. m., one of its trains was switching and coupling cars on the said industrial spur track, and that while engaged in the operation one Herman Cloudy, a brakeman employed by plaintiff and acting in the scope of his employment in the switching and coupling operation as such brakeman, was struck by an overhang of a shed and/or pole erected by the defendants in violation of the minimum clearances set forth in the Industry Track Agreements, which caused him to fall from the car on which he was riding into the path of its wheels, resulting in serious and permanent personal injuries to Cloudy.

That said Cloudy made a claim against it for the injuries sustained by him at the time and place above alleged under the provisions of the Federal Employers' Liability Act, under which the plaintiff did not have a meritorious defense, and would have been found liable to Cloudy for failure of its nondelegable duty to provide him with a safe place in which to work, even though the said Cloudy was injured as a direct result of the primary and active negligence of the defendants in violating the minimum clearance provisions of the Industry Track Agreements by erecting their loading shed and dock and allowing the same to remain in a close and dangerous proximity to the said industrial track.

That the plaintiff notified the defendants of the accident and injuries to Cloudy as well as his subsequent claim, and demanded that defendants assume liability for the payment of said claim on the ground that any negligence of plaintiff at said time and place with respect to said accident was secondary and passive in character, in that defendants' negligence in placing their loading shed in close and dangerous proximity to the spur track was the primary, active and direct cause of the accident and injuries suffered by Cloudy; that the defendants declined to accept responsibility for the handling and payment of said claim; that it entered into negotiations with Cloudy for the settlement of his claim, and that

as a result of the negotiations Cloudy agreed to accept the sum of $35,700 in full and final settlement for such injuries. Under the terms of the settlement plaintiff also agreed to pay an additional sum of $2,018.50 due the Hempstead County Memorial Hospital for medical care rendered to Cloudy following the accident; that in addition thereto plaintiff expended approximately $1,500 as investigation and legal expenses in concluding the said Cloudy claim, making its expenses in connection with the handling and settlement of Cloudy's claim total $39,218.50. That at the time of concluding said settlement with said Cloudy and by agreement with defendants, plaintiff took a release from Cloudy, releasing the plaintiff and the defendants from any and all liability as a result of said accident, a true and correct copy of the release executed by Cloudy, marked Exhibit A, attached to and made a part of the complaint.

At the time of negotiating said settlement plaintiff again demanded that defendants admit their liability for said claim and pay the amounts above stated therefor, but defendants declined.

Plaintiff further alleged that the defendants were negligent in erecting their loading sheds in close and dangerous proximity to the industrial track; that defendants knew or by the exercise of ordinary care should have known that the loading sheds constituted a hazard and danger to plaintiff's employees engaged in switching operations at the time and place in question; that the defendants' negligence was a direct and proximate cause of the injuries suffered by Cloudy; and that the aforementioned negligence of the defendants was active, positive and primary and without which negligence said accident would not have occurred, and plaintiff would not have been exposed to litigation and liability to Cloudy. That the negligence, if any, of the plaintiff was passive, secondary and remote in character and that its liability to Cloudy for his said injuries arose solely under the provisions of the Federal Employers' Liability Act; that plaintiff was not equally at fault with

defendants and plaintiff is entitled to be indemnified by defendants for all loss and damages suffered by it as a result of the claim of Herman Cloudy.

The defendants, in their answer filed March 9, 1961, and in their amended answer filed September 11, 1961, admitted:

That the parties entered into the "Industry Track Agreement" of September 4, 1941, for the construction of 671 feet, rather than 737 feet of industrial track as alleged by plaintiff, and that the same parties entered into a supplement agreement during the year 1944 for the construction of an additional 66 feet of industrial track, thus making a total of 737 feet; that the 1944 agreement contained similar provisions as the agreement of 1941 between the parties; that the agreement dated May 22, 1957, which called for the construction of an additional 185 feet of industrial track contained similar provisions as the 1941 agreement with reference to clearance liability and indemnity, and served to supplement the 1941 agreement.

That Herman Cloudy was employed as a brakeman by the plaintiff and was injured at the time and date alleged by the plaintiff while engaged in the course of said employment. However, the defendants deny that Cloudy was struck by a shed or overhang of the roof located or maintained by them upon or near the track.

The defendants further admitted that plaintiff notified them of the accident, injuries and resulting claim of Herman Cloudy; that the plaintiff demanded that the defendants assume liability; that they declined to accept responsibility for liability, and that the plaintiff paid the sums as alleged in the settlement of Herman Cloudy's claim.

Defendants deny that they negligently constructed and maintained a loading shed upon or near the railway right of way, or that such shed caused or contributed to the cause of injuries sustained by Herman Cloudy, and that the plaintiff and Herman Cloudy were free of negligence.

The defendants alleged to the contrary that any conditions complained of on or about the railway right of way were well known to the plaintiff and its employee, Herman Cloudy, both of whom assumed any and all liability arising from the known surrounding conditions. In this connection, the defendants alleged that the involved shed was constructed and in existence prior to the location of the involved spur track.

The defendants admitted that the 1941 and 1944 Industrial Track Agreements were in full force and effect at the time Herman Cloudy was injured. However, as a further defense they denied that the provisions of either of the Industrial Track Agreements imposed liability upon defendants for injuries sustained through the negligence of the plaintiff, and they denied that plaintiff was relieved of liability for its negligence by the terms of the contract.

The cause was tried to the court without a jury on September 20 and 21, 1961. At the conclusion of the testimony the case was submitted, and the attorneys for the parties were requested to file written briefs and arguments in support of their respective contentions. The briefs and arguments have been received and considered, along with all the testimony and exhibits thereto, and the court now makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

#### 1.

The plaintiff, Louisiana and Arkansas Railway Company, is a corporation organized and existing under and by virtue of the laws of the State of Delaware with its principal place of business being in Shreveport, Louisiana.

The defendants, Nina N. and Graydon Anthony, are citizens of Arkansas and residents of Hope in Hempstead County, Arkansas, and are partners doing business under the name of Graydon Anthony Lumber Company, which has its principal place of business at Hope in Hempstead County, Arkansas.

The amount in controversy exceeds the sum of $10,000, exclusive of interest and costs.

## 2.

The parties entered into an agreement entitled "Industrial Track Agreement" on October 15, 1941, plaintiff being referred to as carrier and the defendants being referred to as shipper, in which the carrier agreed to construct a spur track 671 feet long and to serve the shipper's premises with that track. The shipper agreed to perform all necessary grading and furnish all cross ties required for construction of the track; to pay the cost of work and material to be furnished by carrier, and to pay an annual sum in advance as annual interest rental on metal materials. Inter alia, the parties further agreed as follows:

"5. * * * Shipper shall prevent anyone, except Carrier, as well as refrain from placing or keeping any obstruction closer vertically than 25 feet to nearest rail of Switch, or closer horizontally than 8½ feet to center line of Switch. Carrier's knowledge of such obstructions and its continued operation on Switch shall not be a waiver of this covenant, nor of Carrier's right to recover for such damages to persons or property as may result therefrom. * * *

* * * * * *

"6. * * * Shipper also agrees to indemnify and hold harmless Carrier from loss, damage or injury from any act or omission of Shipper, Shipper's employees or agents, to the person or property of the parties hereto and their employees and to the persons or property of any other person or corporation, while on or about Switch; and if any claim or liability other than from fire shall arise from joint or concurring negligence of both parties hereto it shall be borne by them equally.

* * * * * *

"10. * * * Either party may waive any default at any time of the other without affecting or impairing any rights arising from any subsequent default. * * * "

## 3.

The parties entered into an agreement entitled "Supplement Agreement" during the year 1944, when the spur track was extended 66 feet to a total length of 737 feet. By the supplement agreement the parties agreed that the contract of October 15, 1941, was amended to include the extension of the said track and that said contract, as amended, shall be made the agreement between them.

## 4.

The parties entered into an agreement entitled "Industry Track Agreement" on May 27, 1957, by which the carrier agreed to construct a 185-foot extension to the existing spur track, the shipper agreeing to pay the costs and the increased annual interest rental, and to furnish the cross ties, ballast and grading in the same manner as set out in the previous agreements. The provisions pertaining to clearances, liability and indemnity of the parties are similar to those contained in the earlier agreements. However, the specific terms of this agreement will not be set forth herein since undisputed testimony establishes that the injury occurred on the 66-foot extension of the spur track covered by the 1941 and 1944 agreements.

## 5.

The parties operated under the terms of these contracts from the time the spur track was constructed to the time of the injury to Cloudy. After the construction of the first 671 feet of the spur track was completed in November 1941, the defendants constructed what is referred to in the testimony as the "planing mill building," which was completed prior to 1944. As constructed, this building violated the minimum clearances called for in the 1941 agreement both horizontally by the building line and vertically by the roof line.

In the year 1944, the 66-foot extension to the spur track was completed pur-

suant to the contract entered into by the parties that year, and subsequent to the completion of the 66-foot extension, the defendants constructed what is referred to in the testimony as the "truck loading shed," which was closer to the track than the minimum clearances called for in the agreements horizontally by a line of posts supporting the roof and vertically by the overhang or roof line itself.

In 1956 the spur track had to be "lined over," or moved over various distances from both the planing mill building and the adjoining truck loading shed due to the fact that the plaintiff carrier was using a larger size box car for loading at that time, and such box cars had been striking certain parts of the building. The track was moved over by mutual agreement.

### 6.

At approximately 10:00 p. m., May 15, 1959, one of the plaintiff's locomotives backed onto the spur track in order to remove a loaded car that was ready for shipment. The first coupling was made at the planing mill building where there were positioned two empty box cars. The loaded box car and another empty box car were positioned at a location at what is referred to in the testimony as the "chip box," the end car being Louisiana & Arkansas car No. 15055. The locomotive, which had already coupled the two cars near the planning mill building, then proceeded to couple those two cars with the two remaining cars positioned at the chip box. It was Herman Cloudy's duty as brakeman to make the coupling between these two pairs of cars. The coupling was made and the engineer received the go-ahead signal. There was no indication that anything was amiss until the engineer received a stop signal, both the go-ahead and stop signals having been made with lanterns.

The stop signal had been relayed by A. W. Carey, another brakeman who was riding at the end of the last car. Carey signaled the engineer to stop when he saw a lighted lantern lying in the middle of the track over which the cars had already passed on their journey along the spur track to the main line.

The lantern of Cloudy was on the ground between the rails at a point approximately 15 feet east of the west end of the truck loading shed, and Herman Cloudy was found with his head and body between the inside rail and the truck loading shed, with his legs extending over the inside rail at a point approximately between 15 and 20 feet east of the west end of the truck loading shed. The train at the time of the injury was moving in an easterly direction at approximately 5 to 6. miles per hour, and the points at which Herman Cloudy and his lantern were found were immediately adjacent to the truck loading shed. An ambulance was sent for and Cloudy was taken to a local hospital.

Blood was found at a point 6 or 7 feet east of the west end of the truck loading shed on the inside rail nearest the shed, and there was also blood on the wheels of the plaintiff's car No. 15055, which were on the rail nearest the truck loading shed.

### 7.

The testimony did not clearly establish where all of the train crew were at the time of the injury, but the court finds that after Cloudy had completed his coupling of the two pairs of cars at the chip box, he had given the go-ahead signal with his lantern, climbed aboard between the third and the last car, No. 15055, on an inside ladder attached to the front end of the last car. At the time he reached the top of the ladder something struck him on the head, and the next thing that he remembered was that he was on the ground, not knowing which part of his body, if any, lay across the rails in the path of the car wheels. There is a factual dispute as to whether Cloudy was struck by an object at all, or whether the object, if one did strike him, was a part of one of the cars or a stationary object. There are two facts which convince the court that it was a stationary object, to-wit, the western corner of the roof line of the truck loading shed, immediately adjacent to the

nearest rail of the spur track, which struck Herman Cloudy on his head, thus causing him to fall from the ladder between the cars into the path of the wheels of the last car. The first fact is that the only injury above his waist was a deep gash on the right side of his head. The second fact was that a chipped or splintered place was noted on the end rafter which supported the overhang or roof extension at the west corner of the truck loading shed.

### 8.

Herman Cloudy made claim against the plaintiff to recover damages for his injuries under the Federal Employers' Liability Act, Chapter 2, Title 45 U.S.C.A. § 51 et seq. The plaintiff gave notice thereof to defendant with tender of defense and demand that such defense be undertaken by defendants because it was its position that the injuries and damages were proximately caused by the acts and/or omissions of defendants, and that such acts and omissions were a breach of the agreements mentioned. The tender was declined. The plaintiff then proceeded to make a reasonable settlement with Herman Cloudy by payment of the sum of $35,700. The hospital bill was $2,018.50, and the expenditures for costs and attorneys' fees amounted to $1,500 more, making a total expenditure of $39,218.50.

### Discussion

■ The issues in this case revolve about the terms of the 1941 agreement entered into by the parties which govern the 1941 construction of the spur track and its 1944 extension. The first of these issues concerns the acceptance of the indemnity contracts as consistent with public policy in general and specifically in Arkansas. The second question is concerned with the applicability of the provisions, heretofore set out in the quoted paragraphs 5, 6 and 10 of the agreement, to the facts in this case. The third issue to be decided, depending on which provisions apply to this case, goes to the question of whether it was active or passive negligence on the part of either the carrier or the industry, and whether the plaintiff had waived the provisions of the contract and is estopped to rely upon the contract in support of its claim and for the recovery of the full amount claimed.

So far as the first issue is concerned, the general rule is that spur track agreements which indemnify the carrier are not contrary to public policy. In 44 Am. Jur., Railroads, Sec. 235 (Supp.1961), there appears a comprehensive explanation and rationale of such contracts, starting at page 30 (Supp.1961), as follows:

> "Page 455. Add new paragraph at end of section: Contracts under which a railroad company constructs industrial switches, spurs, or sidetracks, to serve industrial plants situated on property owned by others, frequently provide that the railroad is exempted from, or will be indemnified for, loss to persons or property connected with the industry or business to be served by such spur track. The service afforded the shipper by such additional facilities for the special handling of his freight is not normally required of the railroad under its duties to the public as a carrier, and it may attach such conditions as it sees fit in giving its consent to furnish the particular service. On this theory, stipulations in such contracts exempting the railroad from liability for the destruction of property belonging to the party with whom the contract is made are held not to be contrary to public policy.

> "The judicial interpretation of the indemnity clause in a spur track agreement obviously depends primarily upon the exact wording of the clause involved, the language of which varies greatly in the various cases; it also depends upon the particular circumstances under which the loss was occasioned. Hence, no generalization of the principles impelling the courts to the actual decisions reached is possible or permis-

sible beyond the broad statement that the general rules applicable to the construction of contracts generally, are fully applicable to this type of agreement. Against this background it may be generally stated that the indemnity clause will be construed as protecting the railroad from liability for loss caused by its own negligence, if the language of the contract indicates that this was the intention of the parties, but not from liability for loss caused by its wilful or wanton acts, and that the applicability of the clause does not depend on the existence of negligence on the part of industry.

"Where the liability clause is followed by a specific provision to the effect that in case of joint or concurring negligence of the parties liability should be shared by them, courts will construe the two provisions so as to give effect to both of them.

\*    \*    \*    \*    \*    \*

" \*   \*   \* However, it is well settled that the liability clause does not cover payments made voluntarily by the railroad and without legal obligations."

This general rule was approved in Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., 199 F.2d 725 (8 Cir. 1952), in which the court stated at page 729:

"This contract is broad enough to exempt the Railroad Company from the result of its own negligence. As the contract was not executed by the Railroad Company in its capacity as a common carrier but as the owner of property, such a contract contravenes no public policy of the State of Minnesota. (Citing cases.)

\*    \*    \*    \*    \*    \*

"In Northern Pacific Ry. Co. v. Thornton Bros. Co., supra [206 Minn. 193, 288 N.W. 226, 228], the Supreme Court of Minnesota, in the course of its opinion, said:

" 'Neither law nor public policy prevents the ordinary contractor from buying from a third party indemnity from the pecuniary result of his own negligence. That is legitimate as insurance. How does the same process, with identical result, become illicit simply because they are those of the original and basic contract rather than a collateral one for conventional insurance?' "

The case at bar apparently is one of first impression in Arkansas to the extent that a railroad is seeking indemnification from a shipper for injuries to a third person pursuant to a spur track agreement. Indemnification contracts appear to be generally accepted in Arkansas, for in Carter v. Adamson, 21 Ark. 287, 288 (1860), the Arkansas Supreme Court construed the terms of an indemnity contract in general with no question as to the validity of that type of contract.

So far as spur track agreements are concerned, the only occasion that the Arkansas Supreme Court had to pass on such a contract was in Missouri Pac. R. R. Co., Thompson, Trustee, v. Ross, 211 Ark. 784, 202 S.W.2d 365 (1947), and in this case the court only held that the railroad could not contract against its negligence to the exclusion of rights accruing in favor of third parties. This case did involve a contract similar to the one in the present case, and at the time the railroad had not brought action against the shipper for indemnification. Also, at the time of the accident the railroad was extending the line for its own purposes and not for those of the shipper.

The second issue is more complex in that it presents the question of the interpretation of paragraphs Nos. 5 and 6 of the agreement in the present case, as they pertain to the rights and liabilities of the carrier and the industry where both have been negligent to some degree in causing injury to a third person.

The most comprehensive discussion of this type of contract in a recent case appears in Booth-Kelly Lumber Co. v. Southern Pac. Co., 183 F.2d 902, 20 A.L. R.2d 695 (9 Cir. 1950). In that case a trainman, while riding on one of plaintiff's freight cars in line of duty, was struck and injured by a wood cart left near the tracks by an employee of the defendant in violation of the spur track agreement. Paragraph 7 of the contract in the Booth-Kelly case is similar to paragraph 6 of the contract in the present case, and in footnotes 2 and 3 on page 907 of 183 F.2d it is said:

"This part of the paragraph reads: 'Industry also agrees to indemnify and hold harmless Railroad for loss, damage, injury or death from any act or omission of Industry, its employes or agents, to the person or property of the parties hereto and their employes, and to the person or property of any other person or corporation, while on or about said Track; * * * . and if any claim or liability, other than from fire, shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally.' "

In dealing with this similar fact situation and these similarly worded clauses, the court in the Booth-Kelly case goes into a lengthy and detailed discussion as to the weight to be given the clauses in light of the pre-existing common law rules and the applicability of each clause to the fact situation. Beginning at page 907 the court states:

"This brings us to a consideration of the meaning of paragraph 7. If it contained only that part of the above quoted paragraph down to the semicolon, it would have appeared unquestionably sufficient to require complete indemnity. It is the remainder of this paragraph which the court deemed controlling 'since the railroad was in some measure also at fault.'

"Basic in any determination of the meaning of this whole paragraph is an understanding that when the parties contemplated that there might be claims for indemnity they must have been cognizant of the fact that in the ordinary case the occasion for seeking indemnity would not arise unless the indemnitee had himself been found guilty of some fault, for otherwise no judgment could have been recovered from him. That this is typically true is recognized in the comment under Section 95, Restatement on Restitution, as follows: 'In all of these situations the payor is not barred by the fact that he was negligent in failing to discover or to remedy the defect as a result of which the harm was occasioned; in most of the cases it is because of this failure that he is liable * * *.

" 'The fact that the payor knew of the existence of the dangerous condition is not of itself sufficient to bar him from restitution. In many cases it is only because he had knowledge of the condition that he is liable to the person harmed.'

"If we were to assume that the existence of any negligence on the part of Southern Pacific, without regard to whether it be active or passive, primary or contributory, necessarily threw the case within the last portion of the paragraph (note 3, supra), then one might fairly ask what sort of case must have been contemplated when the parties drew the first portion (note 2, supra), if, as pointed out in the comment quoted, in most cases the liability for which indemnity is sought can arise only because the person claiming indemnity was himself guilty of some negligence?

"In approaching a determination of the meaning of this whole paragraph, it appears to us, initially, that each part of the paragraph was intended to cover certain kinds or types of cases, and that each part refers to a situation different from that contemplated by the other.

And in view of the fact that in most cases where demand for indemnity arises, the claimed indemnitee must have been found liable by reason of some negligence, we think it extremely unlikely that all such cases were intended to be excluded from the operation of the first portion of the paragraph. Otherwise, this portion of the paragraph would have little or no application to any actual case.

"Among the circumstances surrounding the execution of the contract was the state of the common law, and the definition of the common law obligations under which the parties would have been required to function had no such contract been executed. It is fair to assume that the parties had these rules in mind as they considered to what extent they would alter or reaffirm those obligations by their writing.

"The common law rules relating to indemnity and contribution as between parties who have been guilty of breaches of duty under circumstances resembling those here involved are expounded in a great number of decided cases, in Oregon and elsewhere. * * *

* * * * * *

"The rules which these three cases, Washington Gas Co. [Washington Gas Light Co. v. District of Columbia, 161 U.S. 316, 16 S.Ct. 564, 40 L.Ed. 712], Union Stockyards [Union Stockyards Co. of Omaha v. Chicago B. & Q. R. Co., 196 U.S. 217, 25 S.Ct. 226, 49 L. Ed. 453], and Astoria [City of Astoria v. Astoria & C. R. R. Co., 67 Or. 538, 136 P. 645, 49 L.R.A.,N.S., 404] [considered above], exemplify have received approval in many cases, the effect of which has been summarized in the Restatement of the Law of Restitution. The ordinary rule denying indemnity or contribution to a joint tortfeasor, is stated in section 102 as follows:

" 'Where two persons acting independently or jointly, have negligently injured a third person or his property for which injury both became liable in tort to the third person, one of them who has made expenditures in the discharge of their liability is not entitled to contribution from the other.'

"The rule enforced in the Washington Gas Co. and the Astoria cases is stated in section 95 as follows:

" 'Where a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other or which, as between the two, it is the other's duty to make safe, he is entitled to restitution from the other for expenditures properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition.'

"When viewed against the background of these accepted and well-known common law rules, which we think the parties must have had in mind, the separate portions of paragraph 7 of the contract appear to be directed to cover the two types of cases covered by these rules. We think that the first portion of the language here to be construed, (note 2, supra), was intended to cover a case of the kind dealt with in the Washington Gas Co. and the Astoria cases, and in section 95, supra. And we think that the portion following the semicolon (note 3, supra), was intended to provide for contribution in such cases as those represented by the Union Stockyards case, and section 102, supra.

"An important factor in bringing us to this view is our belief that the parties would not have intended that Southern Pacific's rights to indemnity, which it might have claimed in the absence of such a paragraph,

were to be trimmed down, or in any manner diminished. On the other hand, as the trial judge said in his opinion, speaking of Booth-Kelly, it was a fact 'that its interests were served by the making of this contract.' We think it was intended, and effectually stated in the contract, that in a case of the kind described in Restatement section 95, Southern Pacific should have the right to full indemnity, while in a case of the section 102 kind, Southern Pacific should have the right, created by the contract, to contribution to the extent of one-half the damages.

\* \* \* \* \* \*

" * * * Southern Pacific was held liable because of its 'negligent failure to make safe a dangerous condition of land or chattels, which was created by the misconduct of the other', i. e. of Booth-Kelly. That this is the type of case which the compilers of section 95 had in mind is made clear by their comment on the section. The court's finding that defendant's negligence was the 'active, direct, proximate and primary' cause, negatives the existence of the acquiescence mentioned in the later portion of the comment."

In other words, the court construed the first sentence of the indemnity agreement as covering the situation where the railroad became liable to a third person because of its negligent failure to make safe a dangerous condition created by the misconduct of the industry, while it construed the second sentence of the indemnity agreement as referring to the situation where the industry and the railroad, acting independently or jointly, negligently injured a third person. In concluding that the injury involved in the Booth-Kelly case was one of the type covered by the first sentence, the court pointed out that the above distinction between the two sentences must have been intended by the parties, since otherwise the first sentence would have hardly any application at all.

Or, as stated more succinctly in Union Pacific R. Co. v. Bridal Veil Lumber Co., 219 F.2d 825 (9 Cir. 1955), the discussion in the Booth case was summed up as follows at page 833:

"In sum, in this court's view the entire clause of the track contract enunciates the common law on indemnity and contribution except where the parties are in pari delicto under Section 95, Restatement of Law of Restitution; then they divide the loss equally."

In Deep Vein Coal Co. v. Chicago & E. I. Ry. Co., 71 F.2d 963 (7 Cir. 1934), the railroad's trainman in discharge of his duty came in contact with a pole installed by the defendant shipper at a location in violation of its spur track agreement with the plaintiff railroad. This agreement had similar clauses to those set out in the present contract. However, there was a slight difference in the wording in paragraph 10 of the contract in the Deep Vein case which corresponded with the quoted part of paragraph 5 in the instant case in that paragraph 10 contained no specifications as to the clearance in feet when indemnification was promised for injuries arising by reason of such violation to the extent that it was in "dangerous proximity" to said tracks. Paragraph 8 of the contract in the Deep Vein case substantially corresponded to paragraph 6 of the agreement in the instant case.

In deciding the amount recoverable by the railroad, the court made the following statement, beginning at page 964:

"The question must be decided under the terms of the contract. If paragraph 10 applies, appellees were entitled to recover; but, if paragraph 8 governs, appellees cannot prevail. The paragraphs are mutually exclusive.

"Appellant contends that the negligence causing the injury was the joint or concurring negligence of the coal company and the railway, in that the former set its pole danger-

ously near the switch track, while the latter negligently suffered its track to remain in dangerous proximity to the pole, and negligently sent its employe into this dangerous place to work.

"It seems to us that the joint or concurring negligence covered by paragraph 8 is not the negligence of the one party consequent upon the primary negligence of the other. But, be that as it may, paragraph 10 definitely and specifically covers such a case as this. The paragraph defines the rights of the parties where a liability accrues to the railway by reason of the coal company's placing any structure in dangerous proximity to the track. Paragraph 8 is general. Instances may be readily conceived where an injury is the result of the concurring negligence of the two. Such would in general be covered by paragraph 8. But this particular instance of loss to the railway resulting from the coal company's placing of its structure in dangerous proximity to the track is specifically covered by paragraph 10, which specifies that in such case the coal company will protect, indemnify, and save harmless the railway against loss. The very specific paragraph 10, whenever it applies, excludes the application of the general paragraph 8.

"The coal company did erect its pole in such dangerous proximity to the track, and under paragraph 10 must hold the railway harmless against its entire consequential loss."

In Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., supra, in which there was a similar fact situation, the pertinent part of the agreement in question was stated by the court as follows at page 728 of 199 F.2d:

"By the sixth paragraph of this contract appellee covenanted and agreed that it would not 'erect, construct, have or suffer any part of any building, structure, appurtenance or appliance, or any other obstacle or projection, at a less distance than six feet laterally at right angles from the nearest rails of such spur or switching tracks.' Then follows the indemnity agreement by which the Moline Company agreed to save the Railroad Company harmless from and against any and all damages remote as well as proximate, in any wise resulting from any non-performance or non-observance of the foregoing covenant concerning lateral distance from which the Railroad Company might become in whole or in part liable. It is then provided that,

" 'Neither the Railway Company's knowledge or notice of any such non-performance or non-observance, nor its failure to notify its own employees thereof, nor its continued operation of said spur tracks, shall be in any wise deemed a waiver of the foregoing covenant of indemnity.' "

In discussing the applicability of the clauses of that particular agreement to the similar fact situation, the court stated as follows beginning on page 731:

"It is urged that the injuries suffered by plaintiff were not the proximate result of the negligence of the Moline Company in placing this trash box within six feet of the railway tracks. The Railroad Company's cause of action against the Moline Company, however, is not primarily based upon tort, nor is it dependent upon negligence. The liability of the Moline Company arises from its breach of this indemnity provision of the contract. The rule as to proximate cause is not available to the Moline Company because by its contract it agreed to indemnify against loss 'from and against any and all damages, remote as well as proximate, in any wise resulting from any non-performance or non-observance of the foregoing covenant concerning lateral distance or perpendicular height, for which the Railway Company shall become, *in*

*whole or in part,* liable or be charg- ed.' \* \* \* It thus appears that the damages from which the appellant agreed to hold the Railroad Company harmless need not have been caused solely by any negligence on its part, nor was the act of the Moline Company required to be the proximate cause of the loss. A liability resulted even though such act were the remote cause.

\* \* \* \* \* \*

" \* \* \* In so placing this obstacle, the Moline Company was as a matter of law negligent, but whether or not negligent in so doing, it violated this provision of the indemnity agreement. Neither is there any force in the argument that the contract provisions are not applicable because certain employees of the Railroad Company knew of the presence of the trash box and notwithstanding that knowledge it undertook to pass the cars along the track. The contract, however, specifically provides that neither knowledge nor notice of any non-performance or non-observance of the contract by Moline Company 'shall in any wise constitute a waiver of the covenant of indemnity.' The trash box was, when empty, placed within three or four feet of the track by employees of the Moline Company. This violated the clearance provision of the contract and was at least a remote cause of plaintiff's injuries."

There is no doubt but that the provision in paragraph No. 5 with reference to the minimum clearances has been violated by the defendant industry in the present case, making it liable to the plaintiff railroad, regardless of the latter's knowledge of such violations.

Therefore, in light of the rules of law and the discussions in the above mentioned cases it would appear that the next question to be decided in this case is whether the actions of the plaintiff railroad are such that would entitle it to recover 50 percent by virtue of concurring active negligence on its part under the second provision of paragraph 6, or whether it may recover 100 percent by virtue of having been passively negligent only under the first provision of paragraph 6.

The plaintiff contends that its negligence arising from its failure of a nondelegable duty to provide a safe place to work under the provisions of the F.E.L.A. is vicarious only, and as such is passive; and that the negligence of the defendants by building the truck loading shed in violation of the terms of the spur track agreement, which negligence was imputed to the plaintiff under the F.E.L.A., was active negligence.

On the other hand, defendants contend that if negligent at all under the terms of the agreement, they were guilty of passive negligence only in constructing the truck loading shed and by allowing it to remain in dangerous proximity to the spur track; and that the moving of freight cars over the spur track by the plaintiff with notice of the dangerous condition constituted active negligence.

Thus the contentions of the parties in light of the admitted negligence of the railroad's having breached a statutory duty, and the negligence of the industry by a breach of a contractual duty, narrow the question to this consideration: Were both parties actively negligent; or, if only one was actively negligent, which one?

The rules of law which govern the determination of the question are as follows:

(1) The railway company can be guilty of passive negligence and therefore liable to the claimant under its nondelegable duties as set forth in the F.E.L.A. and still recover full indemnity from the industry. Booth-Kelly Lumber Co. v. Southern Pacific Co., supra.

(2) The question of liability of the industry in such cases is to be determined from the indemnity contract and the parties' negligence is to be determined on the basis of the F.E.L.A., 45 U.S.C.A. § 51 et seq., not common law negligence. Booth-Kelly Lumber Co. v.

Southern Pacific Co., supra; Chicago, R. I. & P. Ry. Co. v. Dobry Flour Mills, 211 F.2d 785 (10 Cir. 1954); Wanser v. Long Island Ry. Co., 238 F.2d 467 (2 Cir. 1956).

(3) If it is determined that both the railway and the industry were negligent under the terms of the F.E.L.A., then the railway can recover full indemnity if its negligence is deemed to be passive while the industry's negligence is deemed to be active, but if the negligence of both the railway and the industry is deemed to be active, then the railway can only recover one-half. Booth-Kelly Lumber Co. v. Southern Pacific Co., supra; Wanser v. Long Island Ry. Co., supra; Gollick v. New York Central Ry. Co., 138 F.Supp. 384 (D.C.Mich.1956); Baltimore & O. Ry. Co. v. Alpha Portland Cement Co., 218 F.2d 207 (3 Cir. 1955).

When the contract under which plaintiff is seeking indemnity is considered in this light, it is the court's opinion that plaintiff violated none of the provisions of the contract by switching and coupling its freight cars on the spur track under the existing conditions, but that the defendant industry's violation of its provisions constituted negligence which was the active, direct, proximate and primary cause of the injury to plaintiff's employee, Herman Cloudy. This characterizes the case as coming under the first provision of paragraph 6, quoted above, which grants full indemnity rather than the contribution allowed by the second provision in the same paragraph. By this the court construes "act or omission," referred to in the first provision of the above mentioned paragraph 6, to mean the wrongful or negligent acts by the defendants which would create statutory liability on the part of the railroad under the F.E.L.A. This is a case, then, in which the defendant industry was actively negligent in creating and not correcting the unsafe condition adjoining the spur track which caused the accident, while the plaintiff's only negligence consisted of the defendants' negligence vicariously imputed to it by virtue of its nondelegable duty to its employee,

Cloudy, to provide him with a safe place to work.

The final issue is whether notice to the plaintiff and its acquiescence in the existing conditions amounted to waiver or estoppel on its part such as to bar its recovery.

All parties concerned knew of the dangerous proximity of the truck loading shed to the spur track. Defendants built the shed after the track had been laid. Plaintiff then had the track moved over to allow the passage of larger box cars, and Cloudy himself knew from his own personal experience, as well as having been notified by a warning sign placed by the plaintiff at the entrance of the spur track onto the premises of the defendant, which read as follows: "These buildings will not clear a man on top or side of car."

This question arose in New York Central R. R. Co. v. General Motors Corp., 182 F.Supp. 273 (D.C.N.D.Ohio 1960), where there was an absence of a specific waiver provision, in which the court made the following statement beginning at page 289:

> "Even if plaintiff should have known of the underframe storage, its duty in this respect could have been no greater than that of defendant which had more opportunity for knowledge.
>
> "'[I]t is well settled that, where both parties have the same information, or the same means for ascertaining the truth, there can be no estoppel.' Commercial Inv. Trust v. Bay City Bank, 6 Cir., 1933, 62 F.2d 735, 736.
>
> \* \* \* \* \* \*
>
> "At this point it seems appropriate to discuss and decide the contention of the defendant that 'the railroad consented to the storage of underframes upon the track.' As the defendant's brief on the subject clearly reveals, it is difficult to separate the contention of equitable estoppel and this contention as to the railroad's consent. In the fourth

paragraph on page 23 of defendant's brief I find the following sentence: 'Having consented to it and allowed it (underframe storage, etc.), the railroad cannot now be heard to complain about it.' In analyzing this sentence, the so-called consenting and allowing by the railroad are based upon the observations made by the plaintiff's train crewmen and the silence on the part of the plaintiff regarding the manufacturing procedures being conducted by the defendant on Track A' B'. On this point I have specifically found that the railroad had no knowledge of the manufacturing procedures of the defendant or of the defendant's placing underframes on Track A' B' at column C–10, and that the train crewmen's observations are not imputable to the plaintiff to convey notice and knowledge as contemplated in the Sidetrack Agreement.

"* * * By a mere reading of the exhibits, which reflect the cautiousness and extent of their negotiation, it is proper to conclude that the parties fully understood and comprehended the terms and language of the Agreement and that they intended that any modification or amendment thereof would be initiated and consummated in much the same manner as was the execution of the Agreement, and under no circumstances did the parties contemplate or intend that a modification or amendment could or would be initiated or effected by a laborer, such as the train crewmen of the plaintiff or the welders and hookers employed by the defendant. Consistent with the foregoing conclusion, I further conclude that the evidence failed to establish that the plaintiff consented to the placing of underframes upon Track A' B'."

However, the agreement in the present case has settled the question of waiver on the part of the plaintiff, see paragraphs Nos. 5 and 10 quoted in part above, and this court is not in a position to alter the terms of the agreement especially where these terms are as specific as they are in the present agreement.

■ That such provisions as to waiver are not void as against public policy has been decided by Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., supra.

### Conclusions of Law

1.

The court has jurisdiction of the parties to and the subject matter of the action. Title 28 U.S.C.A. § 1332 (Supp. 1960).

2.

Indemnity provisions of spur track agreements are not void as against public policy.

3.

The plaintiff was passively negligent in failing to provide a safe place to work for its employee, Herman Cloudy. F.E. L.A., Title 45 U.S.C.A. § 51 et seq.

4.

The defendants were actively negligent in violating the terms of the 1941 track agreement which negligence was the direct and proximate cause of Cloudy's injury.

5.

Plaintiff is entitled to indemnity by the defendants for the full amount of its settlement with Cloudy, plus the full amount of reasonable medical expenses and costs of the settlement.

Judgment for the plaintiff should be entered in accordance with the above for $39,218.50, with interest at 6 percent from date, together with costs.