Mo. Pac. R. R. Co. *v.* Southern Cotton Oil Div.

5-3512 . 390 S. W. 2d 113

Opinion delivered May 10, 1965.

[Rehearing denied June 7, 1965.]

*William J. Smith* and *William H. Sutton,* for appellant.

*Wright, Lindsey, Jennings, Lester & Shults,* for appellee.

Ed. F. McFaddin, Associate Justice. This appeal involves a "switch agreement" between the parties. The appellant, Missouri Pacific Railroad Company (hereinafter called "Carrier"), filed this action against appellee, Southern Cotton Oil Division, Hunt Foods and Industries, Inc. (hereinafter called "Shipper"), basing its cause of action on the said switch agreement.

The shipper has a plant in Newport, Arkansas, and property. The germane provisions of the switch agreement are:

"Sec. 2. Shipper shall maintain vertical clearance of 25 feet from nearer rail, and *horizontal clearance of 8½ feet from center-line, of switch;* (emphasis supplied). . . .

"Sec. 3. Shipper also agrees to indemnify and hold harmless Carrier for loss, damage or injury from any act or omission of Shipper, Shipper's employes or agents, to the person or property of the parties hereto and their employes and to the person or property of any other person or corporation, while on or about Switch; . . .

"Sec. 4. Shipper, at Shipper's cost and responsibility, shall continuously maintain scale, live rails and switches, and appurtenances to each thereof. Shipper agrees to indemnify and hold harmless the Carrier from all liability, damages, expenses, attorney's fees and costs, which Carrier may incur or suffer, caused by the maintenance, existence or use of scale, live rails, switches and appurtenances to each thereof. . . ."

On December 3, 1961 Mr. Davis, a brakeman for the carrier, was having cars placed on the scales of one of the switch tracks for weighing. In signalling the engineer, Mr. Davis moved sideways without noticing a concrete minnow pool on the shipper's property. As a result Mr. Davis fell in the pool and received injuries. He threatened to file action against the carrier under the Federal Employer's Liability Act;[1] and after investigation and negotiation the carrier settled Mr. Davis' claim for $4693.60. This settlement was made in good faith after the shipper had refused to participate in any way. Then the carrier sued the shipper for said amount and also costs of investigation, claiming that under the switch contract the shipper was obligated to indemnify the carrier for all such amounts.

The shipper admitted: (a) the foregoing provisions of the switch agreement; (b) the fact that Mr. Davis was injured; (c) the refusal of the shipper to participate in any settlement made by the carrier with Mr. Davis; and (d) the settlement actually made by the carrier with Mr. Davis. But the shipper, by pleading and evidence, insisted that it was not liable in any way, claiming that Mr. Davis did not receive his injuries while on any space or area covered by the switch contract.

The cause was tried before the Court without a jury and resulted in a judgment for appellee (shipper) and this appeal ensued, in which only one point is urged by appellant (carrier), to-wit: "The court erred, as a matter of law, in refusing to render judgment for the appellant." The parties have cited us to a number of cases involving

---

[1] The carrier's liability under the Federal Employer's Liability Law was much broader than the shipper's liability under the switch agreement.

switch agreements with provisions similar to those in the case at bar, some of which cases are: *C.R.I. & P. RR.* v. *Dobry Flour Mills,* 211 F. 2d 785; *Colonial Stores* v. *Central of Ga.,* 279 F. 2d 777; *Mann* v. *Pere Marquette* (Mich.), 97 N.W. 721; *Seaboldt* v. *Penna. RR. Co.,* 290 F. 2d 296; *Anthony* v. *La. & Ark.,* 199 F. Supp. 286; *Union Pac.* v. *Bridal Veil Co.,* 219 F. 2d 826; *Booth-Kelly Co.* v. *So. Pac. Co.,* 183 F. 2d 902; and *Ruddy* v. *N.Y. Central,* 224 F. 2d 96.

We come then to the evidence. The shipper had maintained for more than twenty years a concrete "minnow pool" on its premises. From the pictures introduced in evidence the pool appears to be about four feet square with 6-inch concrete walls rising about 18 inches above the ground level. The outside of the concrete wall nearest the switch track is 8 feet, 8¾ inches from the center of the switch track; that is, the center of the switch track is 8 feet, 8¾ inches away from any part of the minnow pool. The switch agreement, as previously quoted, provided a guarantee of clearance of 8 feet, 6 inches, so the outside wall of the minnow pool lacked 2¾ inches of being within the area contracted by the shipper to be free of obstacles. In order to keep grass from growing around the concrete walls of the minnow pool, the shipper had scraped the ground to the extent of about 10 inches from the outside wall of the minnow pool on all four sides. The carrier claimed that this clearing of the grass around the minnow pool had made a depression about two inches deep next to the concrete walls and that it was this depression which invaded the area of guaranteed clearance.

We hold that a question of fact was made in the case at bar as to whether scraping the grass around the sides of the minnow pool constituted a violation of the free clearance which the shipper was required to maintain for the carrier. The switch agreement did not require that the ground be level. The pictures introduced in evidence show many sloping places. We cannot say as a matter of law that scraping the grass from around the concrete wall to a two inch depth was a violation of the contract for clearance. It was a question of fact whether scraping the

grass adjacent to the minnow pool was a violation of the horizontal clearance provision of the switch agreement.

In its judgment the Circuit Court made these findings:

"2. Defendant has not violated any of the provisions of the contract. . . .

"4. The accident did not occur on premises covered by the contract.

"5. No act or omission or conduct of defendant was a proximate cause of the accident. . . .

"7. The minnow pool with a wall around it was open and obvious to all and had been seen by W. H. Davis daily for a long number of years."

From a careful study of the entire record, we cannot say that the Trial Court was in error under the facts shown.

Affirmed.