The BALTIMORE AND OHIO RAILROAD CO., Plaintiff,

v.

AMERICAN VISCOSE CORPORATION, Defendant.

Civ. A. No. 1032–W.

United States District Court
N. D. West Virginia,
at Wheeling.
March 1, 1963.

Stewart McReynolds, Howard Caplan, Clarksburg, W. Va., for plaintiff.

Charles V. Renner, Benjamin J. Parker, Parkersburg, W. Va., for defendant.

CHARLES F. PAUL, District Judge.

The plaintiff (Railroad) seeks indemnity, or, in the alternative, contribution, from the defendant (Industry) under the provisions of a spur-track agreement, for liability for personal injuries to one, Wade (an employee of the industry), resulting from a collision between a forklift truck being operated by Wade and the tender of the locomotive of a train being operated by the Railroad. The collision occurred December 19, 1955, at the crossing of a ten-foot concrete roadway and spur-track "E" on the Industry's premises in Parkersburg, West Virginia.

Wade instituted suit against the Railroad in the Circuit Court of Wood County, West Virginia. The Railroad invited the Industry to defend, which invitation was refused, the Industry denying liability under the spur-track agreement. The suit resulted in a judgment for Wade against the Railroad, upon a jury verdict for $18,000.00 returned November 18, 1957. The Railroad twice sought review of the verdict and judgment in the Supreme Court of Appeals of the State of West Virginia but writ of error was denied.

This case was tried to the court upon a record consisting of stipulations of the parties; copies of portions of the transcript of the trial of the Wade v. Baltimore & Ohio Railroad Co. case accepted in evidence by counsel's stipulations; various exhibits; some oral testimony taken at the hearing and a view of the premises taken by counsel and the court; and the findings of fact are based upon the record so constructed and the view.

Two paragraphs of the spur-track agreement between the parties, dated

February 13, 1926, are asserted by the Railroad as bases for its alternative claims of indemnity and contribution. Section 8 of the agreement reads as follows (bracketed matter added):

"The Second Party [defendant Industry] agrees not to erect or place, or allow to be erected or placed, on its premises any buildings, structures, fixtures or obstructions of any kind in dangerous proximity to said side-tracks, and agrees to use such means and care generally as will tend to avoid accidents of any kind."

The second paragraph of Section 10 of the agreement reads as follows:

"The Second Party [defendant Industry] also agrees to indemnify and hold harmless the Railroad for loss, damage, or injury from any act or omission of the Second Party, its employes or agents, to the person or property of the parties hereto and their employes, and to the person or property of any other person or corporation, while on or about said tracks; and if any claim or liability other than from fire shall arise from the joint or concurring negligence of both parties hereto it shall be borne by them equally."

Counsel for both parties contend that this court should apply the law of Pennsylvania in this case, arguing that the indemnity and contribution provisions of the agreement were probably to be performed at the principal office of the Industry in Philadelphia, and citing the case of Baltimore & Ohio Railroad Co. v. Alpha Portland Cement Co., 218 F.2d 207 (3 Cir., 1955). This court is willing to accept counsel's contentions in this respect not simply because it seems agreeable to both parties, but because no material conflict between the laws of Pennsylvania and West Virginia seems to be present.

## THE FACTS OF THE ACCIDENT

Spur-track "E" extends south to north. Its purpose is for the delivery of coal to a power house maintained by the Industry, the south wall of which is ap-proximately 90 feet north of the north edge of the west-east concrete roadway. Toward the north end of the power house the spur-track divides into two branches to its terminus some 180 feet north of the north wall of the power house. At the south end of the power house a permanent concrete structure, called a "cinder tipple", spans track "E", supported by concrete piers. The space between the west rail of the track and the west piers is about 5' 9".

A few months before the accident, the Industry erected a temporary wooden and canvas shack or shed, approximately 40' x 20', in the open space between the concrete roadway and the southwest pier of the cinder tipple. The shed was being used as a workshop by an independent contractor who was doing welding and pipefitting work for the Industry. The easterly edge of the shed paralleled the sidetrack for about 40 feet at a distance of 8' 9" from the west rail. The southerly edge of the shed paralleled the north edge of the concrete roadway for about 20 feet at a distance of 2½' from the north edge of the concrete roadway. The shed was about 10½' high at its southeast corner.

December 19, 1955, was a busy day at the Industry, and the Railroad had called out an extra crew to man a steam locomotive as a switch engine. The switch engine had pushed a train of six loaded coal cars north on track "E", with the objective of "spotting" the loaded cars at points on track "E" convenient to the power house. The crew had completed spotting the front three of the cars on the west fork of the track north of the power house, and was backing the switch engine, pulling the remaining three cars, south for the purpose of clearing the switch so that the remaining three cars could be spotted on the east fork of track "E" north of the power house, and it was during this backing maneuver that the locomotive tender and the fork-lift truck collided.

On this morning it was Wade's task to transport, by means of the electric fork-lift truck, bales of wood pulp from the

pulp storage room of the Industry, located to the west of track "E", to the pulp cutting room of the Industry, located at a point on the east side of the "E" track. To accomplish his job, it was necessary for Wade to use the concrete roadway crossing the track. There was a slight incline in the roadway (amounting to about 4 percent) as it approached the track from the west. The bales of wood pulp were piled five or six high in the pulp storage room. It was the practice, and (so Wade understood), the duty, of the fork-lift truck operators to carry a full stack of bales on each trip. Wade had picked up a six-stack load. With the vehicle so loaded it was not possible to drive forward in the normal manner because the height of the stack of bales cut off forward vision. It was, therefore, the practice of Wade and all of the other fork-lift truck operators on the job, to operate the vehicle in reverse. During this operation the driver would throw his left arm over the rear of the truck some 2½ feet behind his seat, and, while working the controls with his right hand, maintain a rear lookout over the left shoulder. Wade was so operating at the time of the accident, and by reason of the angle at which his body and head were turned, he had only peripheral vision to the north. He did not see the approaching locomotive tender until the back wheels of his truck were on the track and the tender was upon him. He did not stop the vehicle before entering on the track because, as he and several others testified, such a stop on the inclined roadway would topple the bales of wood pulp from the lift.

We have then a situation in which neither Wade nor any member of the crew of the locomotive observed the approach of the other moving vehicle in time to take effective counteraction. The only member of the crew of the engine on the west side was the fireman. There were two members of the crew on the ground, directing the switching and spotting operations, but both were on the east side of the train. The fireman attributed his failure to see the approach-ing lift truck to the obstruction of view caused by the presence of the temporary shed and to excessive smoke and steam in the cab of the locomotive caused, in part, by the obstruction to free ventilation by the east wall of the shed.

## DISCUSSION OF AND FINDINGS RESPECTING ISSUES OF LAW AND FACT

The declaration in the State court Wade case charges several acts of negligence on the part of the Railroad crew, including their failure to maintain a flagman; failure to sound a bell or other warning in approaching the intersection; failure to maintain reasonable and proper control; failure to maintain a proper lookout; and excessive speed. On conflicting evidence, the verdict of the jury forecloses the issue on one or all of these claims against the Railroad. That verdict also absolves Wade of contributory negligence.

In this posture of the case, with the existence of common law negligence in its operations as a proximate cause of Wade's injuries adjudicated against it, the Railroad seeks full indemnity, first upon its contention that there was a breach of Section 8 of the agreement by the Industry, and that the measure of damages for the breach is the entire loss suffered by the Railroad, and second, upon its contention that the second paragraph of Section 10 of the agreement specifically provides for full indemnity because the circumstances show that negligence on the part of the Industry was either the sole or the primary cause of the accident.

Let us turn first to the contention that there was a breach of Section 8. The main contention here is that the canvas shed was a "building" or "structure" placed so near the sidetrack as to be in "dangerous proximity" to it. It is the conclusion of this court that there was no breach of the agreement in this respect. The Railroad asks that the court construe this contract to prohibit the use by the Industry of its property by the erection of a structure which in no-

wise obstructs the free and clear passage of the Railroad's trains or infringes on the clearance necessary to the conduct of the Railroad's operations. It would have this court declare as "dangerous" the erection of a structure simply because subsequent activities by the Industry and its employees become hazardous unless ordinary care dictated by the circumstances, including the existence of the structure, is taken. This court cannot so construe this clause of this agreement. It is impossible to escape the conclusion that Section 8 is nothing more than an alternative wording of the familiar "clearance" clause of sidetrack agreements, in which the Industry agrees not to erect, place or maintain any building, object or obstruction within a definite number of feet from the nearest rail, or the center, of the track. Considered *in vacuo* "dangerous proximity" means nothing more than this—leaving the determination of the required clearance in feet and inches to the tender mercies of the court and jury. This result is reached upon familiar principles of contract interpretation and a reading of the agreement as a whole. It should be pointed out that the clearance of the shed, measured from the center line of the track, is more than 11 feet, some 3 feet more than was afforded in the area of the cinder tipple, and that there is nothing in the evidence to suggest that the Railroad, which had the contractual right to refuse service if the sidetrack was or became unsafe, ever objected to the clearance at either point, although it had used the sidetrack many times during the existence of both structures. Furthermore, Mr. Lydick, Terminal Trainmaster for the Railroad, stated that the minimum "proper" clearance, from the Railroad's standpoint, was 8' 6" from the center line of the track.

Counsel for the Railroad suggest in their brief that the east-west concrete roadway was a "structure" and Wade's fork-lift truck an "obstruction" in dangerous proximity to the sidetrack. Here again, it cannot be contended that the concrete roadway was dangerous or a hindrance to the employees and rolling stock of the Railroad, the situation contemplated by Section 8. As for the fork-lift truck, it was not its obstructive nature but its mobility which resulted in the damage. Compare the factual situation in Booth-Kelly Lumber Co. v. Southern Pacific Co., 183 F.2d 902, 20 A.L.R. 2d 695 (9 Cir., 1950).

Finally, the Railroad contends that the Industry breached Section 8 in that it failed to "use such means and care generally as will tend to avoid accidents of any kind". This is a catch-all provision and it is indistinguishably related to the concept of common law negligence, the consequences of which are dealt with in the second paragraph of Section 10. We will, therefore, move to consideration of the Railroad's claim for indemnity under that portion of the agreement.

Prerequisite to *any* recovery by the Railroad under the second paragraph of Section 10 is a finding that the Industry was guilty of some act or omission (i. e., negligence) which resulted in or contributed to the loss suffered by the Railroad in the Wade case. On balance, it seems that the totality of the evidence requires the conclusion that the Industry is chargeable with negligence which was a proximate or contributing cause of the injuries we are here concerned with. The Industry's use of its property to build the canvas shed was not, in itself, a negligent act; yet, it did create an additional circumstance which would indicate to the ordinary prudent man the necessity for additional safeguards. The fact that the drivers were required to back with their loads; the fact that the concrete roadway was inclined, making a precautionary stop difficult; the fact that there was no flagman or flashing signal to indicate the presence of one of the many switching engines that plied the "E" track daily—all of these and other circumstances lead to and compel the conclusion that the Industry was guilty of negligence in failing to exercise reasonable care to provide its employees with a safe method and place of work.

If there were only an indemnity provision, without a concurring negligence clause, in the second paragraph of Section 10 of the agreement, the Railroad might be able to sustain its contention that it is entitled to full indemnity in this case. See the well-considered opinion in New York Central Railroad Co. v. General Motors Corp., 182 F.Supp. 273 (N.D.Ohio 1960). In that case there was a concurring negligence clause, but the clause was expressly made inapplicable to a situation where the Industry placed an obstruction within designated clearances. See also Minneapolis-Moline Co. v. Chicago, M., St. P. & P. R. Co., 199 F. 2d 725 (8 Cir., 1952), and Buckeye Cotton Oil Co. v. Louisville & N. R. Co., 24 F.2d 347 (6 Cir., 1928). But the presence of a joint or concurring negligence clause in this case makes the Railroad's contention that it should be granted full indemnity do violence to the principle that coordinate clauses in a contract are to be construed *in pari materia.*

This is not a case where a railroad has been found liable in the first instance under the provisions of the Federal Employers' Liability Act, which places upon a railroad a non-delegable duty to provide its employees with a safe place to work. In many of those cases, the railroad involved has successfully contended that its negligence was "passive" or "secondary", and that an industry's negligence was "active" or "primary". Booth-Kelly Lumber Co. v. Southern Pacific Co., supra, is the lodestar case; see also Seaboldt v. Pennsylvania Railroad Company, 290 F.2d 296 (3 Cir., 1961); Chicago R. I. & R. P. Co. v. Dobry Flour Mills, 211 F.2d 785 (10 Cir., 1954); Baltimore and Ohio Railroad Company v. Alpha Portland Cement Company, supra, and Louisiana & Arkansas Railway Co. v. Anthony, 199 F.Supp. 286 (W.D.Ark. 1961). Other spur-track cases originating under the Federal Employers' Liability Act have found the railroad as well as the industry guilty of active or primary negligence, and have held the railroads entitled only to contribution under a joint or concurring negligence clause similar to the one at bar. See Pennsylvania Railroad Co. v. Erie Avenue Warehouse Co., 302 F.2d 843 (3 Cir., 1962), reversing 193 F.Supp. 471 (E.D.Pa.1961); Wanser v. Long Island Railroad Company, 238 F.2d 467 (2 Cir., 1956); Colonial Stores, Inc. v. Central of Georgia Railway Co., 279 F.2d 777 (5 Cir., 1960); and Foster v. Pennsylvania R. Co., 201 F.2d 727 (3 Cir., 1953)

The active-primary and passive-secondary dichotomy has been explicitly recognized and clearly defined in the cases hereinbefore cited. That principle dictates that, in the present case, the liability be shared equally by the parties under the contribution clause of Section 10. The jury in the Wade case found plaintiff Railroad guilty of negligence which can only be described as active and primary. This court has found the defendant Industry guilty of negligence of the same variety. Neither party can point to the other's acts or omissions and say, with justification, that those acts or omissions were the sole proximate cause of Wade's injuries. Both were guilty of negligence which concurred proximately and efficiently to cause the accident.

Accordingly, The Baltimore and Ohio Railroad Co. is entitled to recover from American Viscose Corporation a sum equal to one-half of the total amount it has paid out on account of or in defense of the Wade case, with interest at the legal and proper rate of 6% on the amounts included in such total, from the rsepective dates of payment. Inasmuch as the present record does not show the dates of payment, the judgment order shall be prepared by plaintiff's counsel and settled on motion.

This opinion shall be considered as the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.