UNITED STATES of America, Plaintiff,

v.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, et al., Defendants.

In the Matter of the Applications of Muzak, LLC, et al. and DMX Music, Inc., et al., Applicants,

For the Determination of Reasonable Licensing Fees.

No. CIV.A. 41–1395(WCC).

United States District Court, S.D. New York.

March 17, 2004.

---

160. Watkins (8/1/02) Dep. 512–4.

161. *Id.* at 536–7.

162. Watkins (4/26/02) Dep. 46–47, attached as Exhibit 22 to plaintiffs' Appendix.

White & Case LLP (Carol A. Witschel, Esq., I. Fred Koenigsberg, Esq., Stefan M. Mentzer, Esq., Of Counsel), American Society of Composers, Authors and Publishers (Richard H. Reimer, Esq., Of Counsel), New York City, for Defendant American Society of Composers, Authors and Publishers.

Weil, Gotshal & Manges LLP (R. Bruce Rich, Esq., Michael A. Rona, Esq., Jennifer B. Gutterman, Esq., Of Counsel), New York City, for Applicants Muzak, LLC and DMX Music, Inc.

United States Department of Justice, (Robert P. Faulkner, Esq., Of Counsel), Washington, D.C., for Plaintiff United States of America.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Applicants Muzak, LLC ("Muzak") and DMX Music, Inc. ("DMX") (collectively "applicants") bring this application for construction of certain provisions of the Second Amended Final Judgment (the "AFJ2") between the plaintiff United States and the defendant American Society of Composers, Authors and Publishers ("ASCAP").[1] Specifically, applicants seek

---

**1.** In 1941, the United States's civil action against ASCAP for alleged violations of the Sherman Antitrust Act was settled by the entry of a consent decree (the "1941 Consent Decree"). *See United States v. Am. Soc'y of Composers, Authors & Publishers*, 1941 Tr. Cas. (CCH) ¶ 56,104 (S.D.N.Y.1941). The 1941 Consent Decree was amended on March 14, 1950 (the "Amended Final Judgment" or "AFJ"), and again on January 7, 1960 (the "1960 Order"). The terms of these orders regulated the manner in which ASCAP participated within the music industry and gave this Court exclusive jurisdiction under Section XVII of the AFJ to oversee the implementation of these provisions. The AFJ was again amended on June 11, 2001 to create the AFJ2, whereupon the previous judgments, order and all modifications and amendments thereto were vacated. The AFJ2 became effective on September 11, 2001.

a construction of the "per-segment license" provision of the AFJ2 confirming their entitlement to a music publisher catalog-based license, under which the only catalog-based segments subject to a fee would be those that are not already the subject of a direct licensing arrangement between applicants and the publishers. (Applicants' Mem. Supp. Mot. Constr. at 2, 18–19.) The United States also has filed a memorandum to aid the Court in the construction of the consent decree.[2]

For the reasons set forth herein, we conclude that a music publisher's catalog is not a "segment" for purposes of "per-segment" licensing under AFJ2 section VII and that ASCAP is, therefore, not required to issue to applicants a catalog-based license limited to those publishers' catalogs that are not otherwise directly licensed. We also conclude, however, that the existence of such direct licensing relationships may and will be considered by this Court in a rate court proceeding under AFJ2 section IX in determining whether ASCAP has met its burden of proving the reasonableness of the blanket licensing fee it seeks or, in the event that ASCAP fails to meet that burden, in the Court's calculation of a reasonable fee based on all the evidence.

**2.** The participation of the United States is authorized by section IX($I$) of the AFJ2, which permits the government's participation in any fee determination proceeding brought under that section "[p]ursuant to its responsibility to monitor to ensure compliance with" the AFJ2.

**3.** The term "background/foreground music service" is defined by section II(D) of the AFJ2 as follows:

"Background/foreground music service" means a person that transmits performances of music to subscribers and that furnishes to those subscribers equipment not otherwise available to the public that enables subscribers to make the transmitted

## BACKGROUND

Applicants are background/foreground music[3] providers that furnish their services to subscriber-businesses such as restaurants, retail stores, hotels, offices, medical facilities and fitness centers. (Knittel Aff. ¶ 4; Walker Aff. ¶ 4.) Background/foreground music services provide background music[4] for non-intrusively enhancing business settings, and foreground music[5] that is intended to be noticed and enjoyed by the listener, usually as part of a shopping experience. (Knittel Aff. ¶ 10.) Muzak furnishes its services nationwide through a network of approximately twelve regional operations centers and 110 independent affiliates providing music delivery through direct satellite broadcasts, telephone-line transmissions and on-premises delivery via tapes and CDs. (Walker Aff. ¶¶ 3–4.) DMX is a premium digital audio service that furnishes its products globally and nationwide through a network of approximately 175,000 independent affiliates providing music delivery via direct satellite broadcasts and on-premises tapes and CDs. (Knittel Aff. ¶¶ 4, 7–8.) ASCAP is an unincorporated membership association that aggregates the licensing authority of approximately 160,000 composers, authors, lyricists and music publishers, and issues licenses affording users access to its

performances on their premises. A background/foreground music service does not include radio or television stations or networks, cable television networks or systems, persons that transmit renditions of music to private homes, apartments, or hotel or motel guest rooms, or persons that transmit renditions of music to subscribers that charge admission.

**4.** Background music generally consists of original and reorchestrated instrumental pieces. (Knittel Aff. ¶ 10.)

**5.** Foreground music generally consists of contemporary or popular music performed by the original artists. (*Id.*)

amassed repertory of approximately four million musical works. (Applicants' Mem. Supp. Mot. Constr. at 6–7.) For approximately sixty years, applicants have entered into "through-to-the-audience"[6] licensing relationships with ASCAP and similar organizations, such as ASCAP's primary competitor Broadcast Music, Inc. ("BMI"), in order to obtain access and performance rights to their amassed repertories of copyrighted music. (*Id.* at 7.)

Both applicants have the capability of tracking and monitoring precisely the music that they deliver to their subscribers. DMX utilizes "studio" software for on-premises subscribers that records the title, artist, album, label and length of play for musical works delivered to all such subscribers. (Knittel Aff. ¶ 11.) For broadcast subscribers, DMX utilizes "selector" software to track the broadcast channel, title, artist, album, label, and date and time of transmission. (*Id.* ¶ 12.) DMX provides ASCAP with the tracking information from the selector and studio software on a quarterly basis, which ASCAP uses to calculate its members' royalty payments. (*Id.* ¶¶ 13–14.) Muzak has similar capabilities, although ASCAP has only requested and Muzak has only provided information pertaining to Muzak's two most popular broadcast channels on a quarterly basis.

(Walker Aff. ¶ 8.) ASCAP has not requested from Muzak any on-premises musical information. (*Id.*)

To date, applicants have entered into "blanket" licensing relationships[7] with ASCAP.[8] (Applicants' Mem. Supp. Mot. Constr. at 7.) These blanket licenses afford applicants complete access to the ASCAP repertory and the licensing fee reflects neither applicants' actual use of the full repertory nor their dependence on the ASCAP license for access to the rights to the copyrighted music. (*Id.* at 7, 11.) Put differently, the licensing fee for the blanket license is not reduced by applicants' having obtained performance licenses for some musical works directly from ASCAP members. Applicants state that, as a practical matter, they are required to obtain licenses with both ASCAP and BMI because each organization has a distinct large and diverse repertory of works necessary for their programming. (Knittel Aff. ¶¶ 16–17; Walker Aff. ¶¶ 9–10.) They claim that as a result, they enjoy no cost savings from the direct licensing of ASCAP works unless they are able to license *all* of those works directly, an alternative that is neither financially advisable nor feasible because of the size of ASCAP's repertory. (Applicants' Mem. Supp. Mot.

**6.** A "through-to-the-audience" license is defined as "a license that authorizes the simultaneous or so-called 'delayed' performances of ASCAP music that are contained in content transmitted or delivered by a music user to another music user with whom the licensee has an economic relationship relating to that content." AFJ2, § II(S).

**7.** Section II(E) of the AFJ2 defines a "'blanket license'" as a "non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music."

**8.** Applicants state that until the Second Circuit's decision in *United States v. Broad. Mu-*

*sic, Inc. (Application of AEI Music Network, Inc.)*, 275 F.3d 168, 176–77 (2d Cir.2001) (hereinafter "*AEI*"), construing the consent decree between the government and BMI, they previously had been constrained to similar blanket licensing relationships with BMI as well. (Applicants' Mem. Supp. Mot. Constr. at 7 n. 5.) In *AEI*, the Second Circuit concluded that "when an applicant may obtain alternative licensing under the BMI Decree, and the applicant requests a blanket license with a fee structure that reflects such alternative licensing, BMI must advise the applicant of the fee it deems reasonable for such a license. Failure to do so will empower the district court to set a reasonable fee." 275 F.3d at 177. We will discuss the import of this holding *infra* in Part III.

Constr. at 11–12.) Applicants contend that this is inequitable because direct licensing presently results in double payment for the use of a musical work; there is no reason for them to obtain and pay for direct licenses from any ASCAP members because they already have rights to perform all their musical works under the ASCAP blanket license which they were compelled to take as a business necessity. (*Id.* at 12; Knittel Aff. ¶ 16; Walker Aff. ¶ 10.)

Applicants' last ASCAP license expired by its own terms on May 31, 1999. (Witschel Aff., Ex. 30.) Since that time, applicants and ASCAP have been operating under an interim license incorporating the same terms and fees as the previous license. (*Id.*) Applicants and ASCAP have attempted, albeit unsuccessfully, to reach agreement on licensing fees for a new license. (ASCAP Mem. Opp. Mot. Constr. at 4.) Thereafter, ASCAP filed an application for determination of reasonable fees on January 29, 2003. (*Id.*) The interim license remains in effect. (*Id.*) During the fee proceedings, applicants stated their intention to seek a publisher catalog-based "per-segment" license under section VII of the AFJ2 that would provide ASCAP with payment corresponding to the degree to which applicants rely on an ASCAP blanket license, as opposed to direct licensing arrangements with ASCAP members. (Applicants' Mem. Supp. Mot. Constr. at 2.) The licensing fee also would include any adjudicated administrative fee to which ASCAP would be entitled. (*Id.* at 18.) ASCAP opposed applicants' request, leading to the present motion before the Court.

## DISCUSSION

### I.  *Standard of Review*

Construction of consent decrees such as the AFJ2 is governed by the well established standard recently set forth by this Court in *New York ex rel. Spitzer v. St.*

*Francis Hosp.,* 289 F.Supp.2d 378 (S.D.N.Y.2003) (Conner, J.):

"A consent judgment is 'an agreement of the parties entered into upon the record with the sanction and approval of the [c]ourt.' *Schurr v. Austin Galleries of Ill., Inc.,* 719 F.2d 571, 574 (2d Cir. 1983). It is 'a contract to end a lawsuit in which the parties agree to the relief to be provided by the judgment and the wording to effectuate that relief.' *Audiovisual Publishers, Inc. v. Cenco, Inc.,* 964 F.Supp. 861, 875 (S.D.N.Y.1997). For purposes of enforcement, a consent judgment should be construed and interpreted as a contract. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO,* 141 F.3d 405, 406 (2d Cir.1998). Because a consent judgment embodies compromises for the sake of settling a litigation, unlike other contracts it cannot be said to have a discernable 'purpose.' *See ITT,* 420 U.S. at 235–36, 95 S.Ct. 926 (citing *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971)). Rather, the scope of a consent judgment must be ascertained within its four corners. *Armour,* 402 U.S. at 682, 91 S.Ct. 1752; *Int'l Bhd.,* 141 F.3d at 406."

*Id.* at 383–84 (quoting *SEC v. Gellas,* 1 F.Supp.2d 333, 336 (S.D.N.Y.1998) (Conner, J.)).

We also note, however, that

"reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order .... Such reliance does not in any way depart from the 'four corners' rule." *ITT,* 420 U.S. at 238, 95 S.Ct. 926. Moreover, if the wording is susceptible to more than one reasonable

construction, then the court may look to extrinsic evidence. *See Audiovisual Publishers,* 964 F.Supp. at 876; *United States v. Am. Soc'y of Composers, Authors and Publishers,* 782 F.Supp. 778, 788 (S.D.N.Y.1991), *aff'd,* 956 F.2d 21 (2d Cir.1992)."

*St. Francis Hosp.,* 289 F.Supp.2d at 384 (quoting *Gellas,* 1 F.Supp.2d at 336). Accordingly, we now turn to the parties' linguistic arguments with respect to the provisions of the AFJ2 that are at issue.

## II. *"Per–Segment" Licensing Under the AFJ2*

Applicants propose, and ASCAP has heretofore declined to issue, a per-segment license under the AFJ2 that would provide ASCAP with those levels of payments that would correspond to applicants' reliance on ASCAP licenses. (Applicants' Mem. Supp. Mot. Constr. at 18.) The "segments" would consist of the "catalogs," or collections of musical compositions, of the various music publishers that are affiliated with ASCAP. (*Id.* at 18 & n. 11.) Applicants state that the segments subject to an ASCAP fee would be those catalog segments that are not the subject of a direct licensing relationship; the fee would depend on the licensing source for the musical works played, as tracked by applicants' playlists reported to ASCAP on a quarterly basis. (*Id.* at 19.) In addition to the segment fees, applicants would also pay ASCAP an adjudicated administrative fee. (*Id.*) ASCAP contends in response that the AFJ2 does not require it to grant applicants' proposed license on these terms.

### A. *The Language at Issue of Section VII of the AFJ2*

As with any contract, we begin our analysis with the relevant language contained within the "four corners" of the judgment, in order to determine whether it is ambiguous. *St. Francis Hosp.,* 289 F.Supp.2d at 384. Section VII of the AFJ2 governs the issuance of per-segment licenses. It provides:

(A) ASCAP is ordered and directed to offer, upon written request:

(1) To a broadcaster, a per-program license that shall, in addition, cover ambient and incidental uses and shall not require any record-keeping or monitoring of ambient and incidental uses; and

(2) To a background/foreground music service or to an on-line music user, a per-segment license if (a) the music user's performances of music can be tracked and monitored to determine with reasonable accuracy which segments of the music user's activity are subject to an ASCAP license fee; (b) the music user's performances of music can be attributed to segments commonly recognized within the music user's industry for which a license fee can be assessed; and (c) administration of the license will not impose an unreasonable burden on ASCAP; the per-segment license shall, in addition, cover ambient and incidental uses without any record-keeping or monitoring of those uses if that is reasonably necessary to afford a genuine choice among the various types of licenses offered, or of the benefits of any of those types of licenses ....

(B) ASCAP may charge any music user that selects a per-program license or a per-segment license a fee to recover its reasonable cost of administering the license.

(C) Nothing in this [AFJ2] shall prevent ASCAP and any music user from agreeing on any other form of license.

(D) The fee for a per-program license and for any per-segment license is-

sued to an on-line user shall be at the option of ASCAP either:

(1) Expressed in terms of dollars, requiring the payment of a specified amount for each program or segment that contains works in the ASCAP repertory not otherwise licensed for public performance, or

(2) Expressed as a percentage of the music users' revenue attributable to each program or segment that contains works in the ASCAP repertory not otherwise licensed for public performance.

A "per-segment" license is defined under section II(K) of the AFJ2, which provides:

"Per-segment license" means a nonexclusive license that authorizes a music user to perform any or all works in the ASCAP repertory in all segments of the music user's activities in a single industry, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance.

The dispute between applicants and ASCAP centers on the meaning of the term "segment," which is undefined in both of these AFJ2 sections. ASCAP argues, however, that applicants' proposed catalog-based license is not a "per-segment" license as contemplated by the plain language of the AFJ2 because a music publisher's catalog does not involve the user's performance of music and therefore is not a "segment" under the relevant clauses. (ASCAP Mem. Opp. Mot. Constr. at 5, 9,

14.) ASCAP also calls applicants' proposal a blanket license with a "carve-out" for directly licensed works that they are not required to issue under the AFJ2 and the rule of *United States v. Am. Soc'y of Composers, Authors & Publishers (Application of Shenandoah Valley Broad., Inc.)*, 331 F.2d 117 (2d Cir.), *cert. denied*, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964) (hereinafter *"Shenandoah"*).[9] For its part, the United States agrees with ASCAP and also argues that a "segment" necessarily must involve the performance of music by the music user.[10] (United States Mem. Supp. Mot. Constr. at 4.)

### B. *Analysis*

■ We conclude that a music publisher's catalog is not a "segment" for purposes of AFJ2 section VII because such segments necessarily require the user's actual performance of music and do not refer to the content of ASCAP's repertory. Accordingly, ASCAP is not required to issue to applicants a catalog-based license limited to those publishers' catalogs that are not otherwise directly licensed.

■ We apply the following standard to determine whether the relevant language contained within the "four corners" of the AFJ2 is ambiguous.

Whether a provision of a contract is ambiguous is a matter of law for the court.... Contract language is not ambiguous unless "it is reasonably susceptible of more than one interpretation, and a court makes this determination by reference to the contract." ... In review-

---

9. ASCAP, citing the deposition testimony of both providers of background/foreground music as well as their customers, also argues that publisher catalogs are not "commonly recognized" segments of that industry. (ASCAP Mem. Opp. Mot. Constr. at 12–14.) We need not reach the merits of these fact-intensive arguments. As for ASCAP's *Shenandoah* arguments, we will consider them *infra* in Part III.

10. The United States also contends, however, that this Court has the authority, under the AFJ2's "reasonable fees" provision and the Second Circuit's interpretation of similar language in its *AEI* opinion, to consider applicants' proposal for an alternative fee structure in evaluating the reasonableness of ASCAP's blanket licensing fee calculations. (United States Mem. Supp. Mot. Constr. at 6, 12, 19.) *See also infra* Part III.

ing two interpretations of a contract provision, the court "need not determine which is the more likely interpretation" but rather "whether each is sufficiently reasonable to render the clause ambiguous." ... Furthermore, in determining whether an ambiguity exists, a contract should be read as a whole.

*Nat'l Union Fire Ins. Co. v. Travelers Indem. Co.,* 210 F.Supp.2d 479, 485 (S.D.N.Y.2002) (Conner, J.) (citations omitted). We remain, however, cognizant of the well established proposition that "[w]here ... the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does *not* become ambiguous simply because one of the parties later asserts that it intended a different interpretation." *New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1022 (S.D.N.Y. 1991) (emphasis added). Moreover, the mere fact that a contractual term is undefined does not render it ambiguous per se. *See, e.g., World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 183–84 (2d Cir.2003) (applying New York law and stating that "we must decide whether the undefined term 'occurrence' when used in a first-party property damage contract is ambiguous."). Rather, the undefined term must be ambiguous in the context of both the agreement as a whole and the facts and circumstances giving rise to the claim at issue. *Id.* at 184; *see also Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 275, 278 (2d Cir.2000). Finally, "a word may unambiguously exclude certain meanings while still being ambiguous in other contexts." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. L.L.C.,* No. 01 Civ. 9291(JSM), 2002 WL 1163577, at \*6 (S.D.N.Y. June 3, 2002), *aff'd,* 345 F.3d 154 (2d Cir.2003).

Although both ASCAP and applicants agree that the term "segment" was left undefined in order to provide music users with a degree of flexibility in their licensing arrangements (Applicants' Mem. Supp. Mot. Constr. at 14; ASCAP Mem. Opp. Mot. Constr. at 8–9), they disagree as to whether the meaning of the term encompasses the catalog-based license sought by applicants. We conclude that although "segment" is an undefined term, the plain language of the relevant AFJ2 provisions is inconsistent with applicants' proposed catalog-based license. As ASCAP and the United States point out, the term "segment" modifies language pertaining directly to the activities of the music user, in the present case, Muzak and DMX. *See* AFJ2, §§ II(K), VII(A)(2). Even accepting as true applicants' contention that publishers' catalogs are commonly recognized and utilized for other licensing purposes throughout the music industry (Applicants' Mem. Supp. Mot. Constr. at 21–23), the catalogs nevertheless are not the performance activities of applicants, and therefore are not "segments" under the AFJ2.

Moreover, application of the elementary principle of contract construction that the language of the "per-segment" license clause must be read in *pari materia,* or in conjunction with, the immediately preceding and coordinate "per-program" clause, further reinforces our conclusion that a "segment" must be related to a performance by the music user, such as the provision of background or foreground music via, for example, satellite radio transmission or on-premises devices such as CDs.[11] *See, e.g., Balt. & Ohio R.R. Co. v. Am. Viscose Corp.,* 214 F.Supp. 287, 292 (N.D.W.Va.1963) (stating rule). The per-program clause requires ASCAP to grant to broadcasters[12] non-exclusive licenses

---

**11.** ASCAP suggests a similar construction of the term "segment," albeit in conjunction with other licensing terms that applicants oppose quite emphatically. *See infra* note 13.

**12.** The AFJ2 defines a " 'broadcaster' " as

"to perform ASCAP music in all of the broadcaster's programs, the fee for which varies depending upon which segments contain ASCAP music not otherwise licensed for public performance." AFJ2, § II(J); *see also* AFJ2, § VII(A) (operative clause). Thus, although we will not articulate a conclusive definition of the term "segment" because that is not necessary for resolution of the present controversy, we nevertheless conclude that applicants' proposed "per-segment" license does not comport with the plain language of the AFJ2, which clearly indicates that the term refers to a performance by the music user or background/foreground music service.[13] Accordingly, we deny applicants' request for a catalog-based per-segment license.

---

any person who transmits audio or audiovisual content substantially similar to content that is transmitted by over-the-air or cable radio or television stations or networks as they existed on the date of entry of this [AFJ2] or that transmits the signal of another broadcaster: (1) over the air, (2) via cable television or direct broadcast satellite, or (3) via other existing or yet-to-be developed transmission technologies, to audiences using radios, television sets, computers, or other receiving or playing devices.

AFJ2, § II(F).

13. In its memorandum, ASCAP reiterates its proposal, previously made to applicants in August 2003, suggesting a per-segment license that it believes comports with the requirements set forth in section VII of the AFJ2. (ASCAP Mem. Opp. Mot. Constr. at 19–27; Witschel Aff., Ex. 31.) In that proposal, ASCAP suggests that applicants' "on-premises" tapes, CDs, digital players and satellite channels are the proper performance-based segments to form the bases for the per-segment licenses. (ASCAP Mem. Opp. Mot. Constr. at 20.) ASCAP notes that applicants' monitoring software has the capability of determining with "reasonable accuracy" which of those performance-based segments contains materials subject to an ASCAP-licensing fee. (*Id.* at 21.) It emphasizes, however, that as with per-program licensing, the fee would not be discounted proportionally for the separate direct licensing of works contained in any segment. (*Id.* at 22.)

ASCAP argues that its proposal comports with the "genuine choice" provision of the AFJ2 because the district court's discussion of the 3M company's direct licensing arrangements in the now over twenty-five year-old opinion in *Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers*, 400 F.Supp. 737, 771–75 (S.D.N.Y.1975), *rev'd*, 562 F.2d 130 (2d Cir. 1977), *rev'd sub nom. Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), demonstrates that it is in fact technically and economically feasible for a background/foreground music service to forego ASCAP licensing completely in favor of direct licensing. (*Id.* at 24.) ASCAP argues that the value of an ASCAP license is based on the efficiency, freedom and convenience that it provides for users such as applicants. (*Id.* at 25–26.)

Applicants contend that the Court should reject ASCAP's per-segment license proposal because it lacks the indicia of reasonableness demanded by the AFJ2. (Applicants' Reply Mem. Supp. Mot. Constr. at 16.) They cite deposition testimony and affidavits in support of their contention that ASCAP's proposal is not commercially feasible and is therefore not a "genuine choice" because: (1) complete direct licensing would require successful negotiations with over 1,700 different music publishers, a "significant percentage" of whose works are part of the ASCAP repertory; and (2) it would be impossible to satisfy their customers' needs solely by providing performance segments that contain only directly-licensed music programming. (*Id.* at 17–18.) Accordingly, applicants also submit an alternative licensing request for a blanket license with a fee discounted for directly licensed works, a proposal that echoes that of the United States. (*Id.* at 20.) *See infra* Part III.

In light of applicants' expressed interest in and willingness to accept the blanket licensing alternative proposed by the United States, we decline to address the reasonableness of ASCAP's proposed construction of the "per-segment" license and the degree with which it comports with the AFJ2. We instead turn to the competing interpretations offered by the government and ASCAP *infra* in Part III.

## III. Alternative Fee Structures Under Section IX of the AFJ2

The United States argues that under the Second Circuit's decisions in *AEI* and *Shenandoah,* section IX of the AFJ2, the "reasonable fee" rate court clause, provides this Court with the authority to order a blanket license with a fee discounted to reflect applicants' direct licensing of ASCAP music. (United States Mem. Supp. Mot. Constr. at 6–7, 11.) The United States also argues that such a license is indeed a blanket license under the AFJ2, regardless of the fee structure. (*Id.* at 18.) Applicants endorse this interpretation of the AFJ2 and request such a license from ASCAP, with fees to be set in accordance with the procedure set forth in section IX. (Applicants' Resp. Mem. at 2–3.) ASCAP argues in response that this construction of section IX contradicts the plain language of the AFJ2 and the parties' intent during drafting,[14] and also violates the Second Circuit's decision in *Shenandoah.* (ASCAP Resp. Mem. at 8–9, 16.) ASCAP also characterizes the *AEI* decision as "extrinsic evidence" that should have no bearing on this Court's interpretation of section IX. (*Id.* at 18.)

## A. The Language at Issue of Section IX of the AFJ2

Section IX of the AFJ2 provides for the determination of reasonable license fees, and also gives this Court a significant role in that process. It states in relevant part:

(A) ASCAP shall, upon receipt of a written request for a license for the right of public performance of any, some or all of the works in the ASCAP repertory, advise the music user in writing of the fee that it deems reasonable for the license requested or the information that it reasonably requires in order to quote a reasonable fee. In the event ASCAP requires such additional information, it shall so advise the music user in writing of the fee that it deems reasonable within sixty (60) days of ASCAP's receiving such information. If the parties are unable to reach agreement within sixty (60) days from the date when the request for a license is received by ASCAP, or within sixty (60) days of ASCAP's request for information, whichever is later, the music user may apply to the Court for a determination of a reasonable fee retroactive to the date of the written request for a license, and ASCAP

---

**14.** We note that ASCAP's submissions include a great deal of extrinsic evidence pertaining to the negotiation of the AFJ2 between ASCAP and the United States, such as the affidavit of attorney Jonathan Rich describing ASCAP's position during that process, as well as numerous letters and draft agreements that were exchanged between the parties thereto. ASCAP relies on this extrinsic evidence in support of this argument that the parties did not intend either sections VII or IX of the AFJ2 to permit either a per-segment or blanket license with a "carve-out" for directly licensed works. (ASCAP Mem. Opp. Mot. Constr. at 17–19; ASCAP Resp. Mem. at 13–14.) In response, the United States has submitted both additional evidence and its competing interpretation of the evidence put forth by ASCAP. (United States Mem. Supp. Mot. Constr. at 15–17.) Inasmuch as our conclusions herein are based on the plain language of the AFJ2 and the courts' constructions of similar language, we need not engage in a review of the extrinsic evidence. *See, e.g., St. Francis Hosp.,* 289 F.Supp.2d at 384; *see also Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002) (noting that "a party 'is precluded from introducing extrinsic evidence of the contract's purpose in order to vary the plain meaning of the writing'" (quoting *Investors Ins. Co. of Am. v. Dorinco Reins. Co.,* 917 F.2d 100, 104 (2d Cir.1990))).

shall, upon receipt of notice of the filing of such request, promptly give notice of the filing to the Assistant Attorney General in charge of the Antitrust Division. If the parties are unable to agree upon a reasonable fee within ninety (90) days from the date when ASCAP advises the music user of the fee that it deems reasonable or requests additional information from the music user, and if the music user has not applied to the Court for a determination of a reasonable fee, ASCAP may apply to the Court for the determination of a reasonable fee retroactive to the date of a written request for a license and ASCAP shall upon filing of such application promptly give notice of the filing to the Assistant Attorney General in charge of the Antitrust Division.

(B) In any such proceeding, the burden of proof shall be on ASCAP to establish the reasonableness of the fee it seeks except that, where a music user seeks a per-segment license, the music user shall have the burden of demonstrating that its performances of music can be tracked and monitored to determine with reasonable accuracy which segments of the music user's activity are subject to an ASCAP fee and of demonstrating that the music user's performances of music can be attributed to segments commonly recognized within the music user's industry for which a license fee can be assessed.

(C) . . . .

(D) Should ASCAP not establish that the fee it requested is reasonable, then the Court shall determine a reasonable fee based upon all the evidence.

*Id.* It is undisputed that this provision of the AFJ2 is identical in all relevant aspects to the terms of the original AFJ.[15] (United States Mem. Supp. Mot. Constr. at 6 & n. 7; ASCAP Resp. Mem. at 10.) *See also supra* note 1.

**B.  *Analysis***

■ The Second Circuit's decisions in *AEI* and *Shenandoah* provide us with the context within which to evaluate the arguments of the parties. In *Shenandoah*, the applicants were television stations who requested a new form of blanket and per-program licenses under the AFJ that "would exclude not only programs obtained from a television network ... but also programs consisting of filmed or taped material made by independent film producers ...." 331 F.2d at 121. ASCAP declined to grant this license to the applicants, and the district court refused to order it to do so. *Id.* In affirming the decision of the district court, the Second Circuit reviewed the AFJ in its entirety and concluded that ASCAP was not required to grant to the applicants this kind of license because it was not contemplated in the text of the AFJ as a license that individual broadcasters could demand. *See id.* at 122–23. In so holding, the court stated that "[i]t is important to the obtaining of consent decrees, on which the effective enforcement of the antitrust laws depends in no small degree, that defendants who sign them should know these will not be stretched beyond their terms." *Id.* at 123–24. Thereafter, in *United States v. Am. Soc'y of Composers, Authors & Publishers (Application of Metromedia, Inc.)*, 341 F.2d 1003 (2d Cir.), *cert. denied*, 382

---

15. AFJ2 section IX differs from the reasonable fee clause of the original AFJ because it permits ASCAP to: (1) request from applicants information relevant to setting fees; and (2) petition the Court for a reasonable fee, in the event that an applicant has not already done so. (United States Mem. Supp. Mot. Constr. at 6 n. 7.)

U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965) (hereinafter *"Metromedia"*), the Second Circuit characterized *Shenandoah* as a case wherein the applicants were precluded only from obtaining "a license whose scope or coverage differs from that contemplated by the decree . . . ." [16] *Id.* at 1008.

In the more recent *AEI* decision, the Second Circuit addressed the present applicants' request for a blanket license with a "carve-out" fee structure pursuant to the rate court provision of the final consent judgment in the antitrust action between the United States and BMI. 275 F.3d at 171. The district court in that case read *Shenandoah* to preclude the issuance of and computation of a fee for a blanket license with "carve-outs" for fees paid for directly-licensed works because that was a form of license not expressly mandated by the decree. *Id.* at 173–74. On appeal, the Second Circuit vacated the judgment of the district court, concluding that *Shenandoah* did not preclude the issuance of a blanket license that "would differ from the traditional blanket license only in its fee structure" because "whatever relevance *Shenandoah* might have to requests for new types of licenses, it does not compel the same outcome here since Applicants have requested a blanket license with a revised fee structure." *Id.* at 177. The Second Circuit concluded that the reasonable fee/rate court provision of the BMI

decree, identical in all relevant aspects with the AFJ2 in the present case,[17]

require[s] that when an applicant may obtain alternative licensing under the BMI decree, and the applicant requests a blanket license with a fee structure that reflects such alternative licensing, BMI must advise the applicant of the fee that it deems reasonable for such a license. Failure to do so will empower the district court to set a reasonable fee.

*Id.* at 177. Accordingly, the Second Circuit vacated the district court judgment to the contrary and remanded the case for further proceedings. *Id.*

Reconciling the propositions that may be gleaned from these cases, *Shenandoah* stands for the proposition that this Court may not require ASCAP to grant applicants a license structured in such a manner that its scope or coverage is not contemplated by the plain language of the AFJ2. *See* 331 F.2d at 122–23. The alternate holding from *Metromedia* makes clear that this preclusion does not apply to those applicants' claims that are limited merely to reasonable fee demands. *See* 341 F.2d at 1008–09 (stating that "unlike the applicants in *Shenandoah*, Metromedia is not seeking a license whose scope or coverage differs from that contemplated by the decree but rather is asserting a claim to a reasonable fee"). Finally, the recent *AEI* decision illustrates the application of these principles, and emphasizes

---

**16.** In *Metromedia*, the applicant, an owner and operator of a chain of radio and television stations and an ASCAP licensee, filed a motion in the district court to punish ASCAP for contempt for an alleged violation of the AFJ stemming from a dispute about ASCAP's obligation to entertain the applicant's request for a license with a fee structure that differed significantly from previously-granted blanket licenses. 341 F.2d at 1004–06. The district court denied the applicant's contempt motion. *Id.* at 1006. On appeal, the Second Circuit held that the applicant, a non-party, lacked the standing to move in a "government anti-

trust action to punish the defendant ASCAP for contempt." *Id.* at 1007. The court, however, also stated as an alternate holding that even if Metromedia had standing to move for contempt against ASCAP, it was precluded from seeking a reasonable fee determination from the court without first having followed and exhausted the fee quoting and negotiation procedure set forth in the decree. *Id.* at 1008–09.

**17.** *Compare AEI*, 275 F.3d at 173, *with* AFJ2, § IX.

that *Shenandoah* may not be utilized to preclude the issuance of blanket licenses with reasonable fees that reflect direct licensing arrangements previously entered into by applicants.

Indeed, a rule permitting the blanket licensing fee to reflect prior direct licensing arrangements is in accord with previously articulated principles for the determination of reasonable fees that district courts apply in their rate court capacities. These principles, keyed to a determination of the license's fair market value, include the rate court's consideration of ASCAP's considerable market power as a relevant factor in determining whether the comparable licenses to other music users are a reliable aid in determining a reasonable fee. *See Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 570–71 (2d Cir.1990) (hereinafter *"Showtime"*) ("The opportunity of users of music rights to resort to the rate court whenever they apprehend that ASCAP's market power may subject them to unreasonably high fees would have little meaning if that court were obliged to set a 'reasonable' fee solely or even primarily on the basis of the fees ASCAP had successfully obtained from other users."); *accord United States v. Broad. Music, Inc. (Application of Music Choice, Inc.)*, 316 F.3d 189, 194 (2d Cir. 2003) (discussing *Showtime* and its definition of "fair market value" as the " 'the price that a willing buyer and a willing seller would agree to in an arm's length transaction.' "). The rate court inquiry also encompasses consideration of rates set by previously negotiated agreements, "as well as changed circumstances that may make prior benchmarks outdated measures of fair value." *United States v.*

*Am. Soc'y of Composers, Authors & Publishers (Applications of Capital Cities/ABC, Inc. & CBS, Inc.)*, 831 F.Supp. 137, 144–45 (S.D.N.Y.1993) (Conner, J.). "With regard to changed circumstances, the Court must account for alterations in the economic conditions confronting the parties, as well as appraise variations in the nature and value of the rights at issue." *Id.* at 145. Indeed, the rate court "need not conduct itself without regard to the context in which it was created." *Showtime*, 912 F.2d at 570.

ASCAP argues in response that the United States's construction of the AFJ2 violates the plain language of the decree because it: (1) is not a blanket license as the fee would vary in direct proportion to the extent to which the music user actually performs ASCAP music; and (2) is inconsistent with the "genuine choice" provision of section VIII of the AFJ2. (ASCAP Resp. Mem. at 6, 8–9.) ASCAP also argues that *Shenandoah* precludes the license proposed by the United States because the Second Circuit's decision in *AEI* is distinguishable since the BMI decree construed therein is significantly different in its entirety from AFJ2. (*Id.* at 11, 16.) We address these contentions in turn.

ASCAP's first argument is that the license proposed by the United States and endorsed and requested by applicants constitutes neither a "blanket" license nor a "full-repertory" license under the AFJ2. (ASCAP Resp. Mem. at 5.) ASCAP relies primarily on section II(E) of the AFJ2, which defines a " 'blanket license' " as a "non-exclusive license that authorizes a music user to perform ASCAP music, the fee for which does not vary depending on the extent to which the music user in fact performs ASCAP music,"[18] as well as the

---

18. ASCAP also relies on section VI of the AFJ2, which sets forth ASCAP's licensing obligations and echoes the blanket licensing definition set forth in section II(E). (ASCAP Resp. Mem. at 7.) Section VI of the AFJ2 provides in relevant part:

courts' descriptions of blanket licensing in opinions such as *United States v. Am. Soc'y of Composers, Authors & Publishers (Application of Capital Cities/ABC, Inc.),* 157 F.R.D. 173, 204–05 (S.D.N.Y.1994) (Conner, J.) (hereinafter *"Capital Cities"*).[19] (ASCAP Resp. Mem. at 6–7.) ASCAP claims that the government's alternative fee-based proposal is inconsistent with this definition because the licensing fee *would* in fact vary depending on the extent to which applicants perform AS-CAP music. (*Id.* at 6.) We disagree with this argument, and we agree with the United States's contention that its proposed fee structure remains consistent with the AFJ2's definition of blanket license as set forth in section II(E). (United States Mem. Supp. Mot. Constr. at 18–19.) As the United States points out, even if applicants stopped performing or utilizing ASCAP music entirely, they would still be liable to ASCAP for the discounted blanket license fee. (*Id.*) Put differently, any fee variance for the blanket license would not be based on the frequency or degree of ASCAP music performance, but rather on the existence of applicants' direct licensing relationships with ASCAP members. Applicants' substantive rights and obligations under the license would not change as a result of direct licensing; only the fee that they would pay to AS-CAP in consideration of those rights and obligations would change. Accordingly, we disagree with ASCAP's contention that the proposal of the United States does not comport with the definition of "blanket license" as set forth in the AFJ2.

We next address ASCAP's contention that the government's alternative fee proposal renders meaningless the "genuine choice" provision of section VIII of the AFJ2. (ASCAP Resp. Mem. at 6, 8–9.) Section VIII was added as part of the 2001 revision to the AFJ that created the AFJ2, *see also supra* note 1, and was intended to ensure that per-segment or per-program licenses are a viable alternative to blanket licenses. (*Id.* at 9.) Section VIII provides, in relevant part:

(A) ASCAP shall use its best efforts to avoid any discrimination among the various types of licenses offered to any group of similarly situated music users that would deprive those music users of a genuine choice among the various types of licenses offered, or of the benefits of any of those types of licenses. (B) For a representative music user, the total license fee for a per-program or per-segment license shall, at the time

ASCAP *is hereby ordered and directed to grant to any music user making a written request therefor a non-exclusive license to perform all of the works in the ASCAP repertory;* provided, however, that ASCAP shall not be required to issue a license to any music user that is in material breach or default of any license agreement by failing to pay to ASCAP any license fee that is indisputably owed to ASCAP. ASCAP shall not grant to any music user a license to perform one or more specified works in the ASCAP repertory, unless both the music user and member or members in interest shall have requested ASCAP in writing to do so, or unless ASCAP, at the written request of the prospective music user shall have sent a written notice of the prospective music user's request for a license to each

such member at the member's last known address, and such member shall have failed to reply within thirty (30) days thereafter. AFJ2, § VI (emphasis added).

19. In *Capital Cities*, this Court described a blanket license as "a license which enables the music user, for a pre-determined fee, to use as much or as little ASCAP music in its programming as it wishes without incurring copyright liability, without reporting or even keeping track of such music use." 157 F.R.D. at 204–05. We contrasted that definition of blanket licensing with the "per-program license" under the AFJ, which "enables a music user to use as much ASCAP music as it wishes, but requires the user to report music use so that ASCAP can determine which programs trigger a fee." *Id.* at 205.

the license fee is established, approximate the fee for a blanket license; for the purpose of making that approximation, it shall be assumed for the purposes of this Section VIII(B) that all of the music user's programs or segments that contain performances of ASCAP music are subject to an ASCAP fee. (C) ASCAP shall maintain an up-to-date system for tracking music use by per-program and per-segment licensees; ASCAP shall not be required to incur any unreasonable costs in maintaining such system; ASCAP may require its members and such licensees to provide ASCAP with all information reasonably necessary to administer the per-program or per-segment license including, but not limited to:

(1) cue sheets or music logs;

(2) the date of performance of a work and identification of the program or other segment of the music user's activities that contained the performance;

(3) the title of the work performed; and

(4) the writer, publisher or performing artist;

such requirements shall be designed to avoid unreasonable burdens on ASCAP, ASCAP members and licensees.

(D) The terms and requirements of any license shall be designed to avoid imposing any unreasonable burdens or costs on licensees or ASCAP.

ASCAP claims that the United States's proposed construction of the AFJ2 renders section VIII "nonsense" because providing applicants with blanket license fee discounts reflecting direct licensing arrangements eliminates the need for the "approximation" set forth therein. *See* AFJ2, § VIII(B). (ASCAP Resp. Mem. at 9–10.) We disagree with this contention because we read the "genuine choice" provision as intended merely to ensure that all of the different types of licenses remain economically reasonable options for prospective applicants. Put differently, the plain language of section VIII indicates that it is intended to level the financial playing field between the different types of licenses, and to preclude ASCAP from compelling music users into accepting license *A* by overpricing license *B*. In our view, nothing in the language of section VIII may fairly be read as precluding any kind of reasonable fee structure with respect to the different licenses discussed therein.

Finally, ASCAP argues that *AEI* is not controlling because the AFJ2 differs from the BMI consent decree at issue in that case. (*Id.* at 16–19.) Specifically, ASCAP contends that the overall contexts of the decrees are significantly different because the BMI decree, unlike the AFJ2: (1) does not define or refer to blanket licensing; (2) lacks a "genuine choice" provision; (3) uses different language to describe BMI's obligation to issue per-program licenses; (4) does not contain a per-segment license; and (5) lacks language comparable to section VI of the AFJ2. (*Id.* at 17.) ASCAP points out correctly that the Second Circuit's ruling in *AEI* did not overrule *Shenandoah's* applicability to the ASCAP decree, and that the holding of *AEI* is limited to the BMI decree. (*Id.* at 18.) *See AEI*, 275 F.3d at 177. We disagree, however, with ASCAP's contention that the *AEI* decision is merely extrinsic evidence that should not be used for construing the AFJ2. (ASCAP Resp. Mem. at 18–19.) It is indisputable that the BMI and ASCAP decrees are not entirely identical. We already have concluded herein, however, that the "genuine choice" and "per-segment" licensing provisions do not preclude the issuance of a blanket license with a fee structure that reflects applicants' previous direct licensing arrangements. Moreover, the decrees' fee calculation provisions are identical, and the decrees are sufficiently comparable in their entireties to warrant following the analytic trail blazed in a pub-

lished opinion[20] by the court that has immediate appellate jurisdiction over this tribunal. Accordingly, we conclude that the present AFJ2 may be construed to permit the issuance of a blanket license with a fee structure that reflects direct licensing arrangements previously entered into by applicants.

## CONCLUSION

For all of the foregoing reasons, we conclude that a music publisher's catalog is not a "segment" for purposes of "per-segment" licensing under AFJ2 section VII and that ASCAP is, therefore, not required to issue to applicants a catalog-based license limited to those publishers' catalogs that are not otherwise directly licensed. We also conclude, however, that the existence of such direct licensing relationships may and will be considered by this Court in a rate court proceeding under AFJ2 section IX in determining whether ASCAP has met its burden of proving the reasonableness of the blanket licensing fee it seeks or, in the event that ASCAP fails to meet that burden, in the Court's calculation of a reasonable fee based on all the evidence.

SO ORDERED.

---

**20.** In its memorandum responding to the arguments of the United States, ASCAP devotes a great deal of discussion to what it perceives as a position by the government in the present litigation that is inconsistent with positions taken by the United States in both related ASCAP proceedings and in the BMI antitrust litigation, at one point claiming that the "[g]overnment is trying to have it both ways." (ASCAP Resp. Mem. at 13–15, 18–19.) ASCAP does not, however, attempt to invoke the doctrine of judicial estoppel in support of its position, presumably because of the legal, and not factual, focus of the argumentation at issue. *See, e.g., TM Patents, L.P. v. Int'l Bus. Machines Corp.*, 72 F.Supp.2d 370, 379–80 (S.D.N.Y.1999) (stating that "IBM's invocation of judicial estoppel is improper, as that doctrine applies only to inconsistent factual positions, not to issues of law."); *see also GTFM, Inc. v. Solid Clothing, Inc.*, 215 F.Supp.2d 273, 303 (S.D.N.Y.2002) ("Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior legal proceeding."). Accordingly, we confine our inquiry to the arguments at hand as they relate to the legal landscape governing the ASCAP consent decree as it exists presently.